AARON RICHARD GOLUB, ESQUIRE
Attorney for Plaintiffs
34 East 67th Street, 3rd Floor
New York, New York 10021
ph: 212-838-4811
fx: 212-838-4869
e-mail: argolub@argolub.com
ARG 6056

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
AARON RICHARD GOLUB, and
AARON RICHARD GOLUB, ESQUIRE, P.C.

                                        Plaintiffs,

              -against-

HOLLYWOOD GANG PRODUCTIONS, LLC,

                                        Defendants.
-----------------------------------------------------------X

Civ. Action No.: 13 CV 0963

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs AARON RICHARD GOLUB ("Golub") and AARON RICHARD GOLUB,

ESQUIRE, P.C. ("ARGPC") (collectively "Plaintiffs"), by their attorney, AARON RICHARD

GOLUB, ESQUIRE, as and for their complaint, alleges as follows:

## THE PARTIES

       1.     Golub is a resident of the County, City and State of New York. Golub is

an attorney duly admitted to practice law before the courts of the State of New York.

       2.     ARGPC is a domestic professional corporation duly organized under the

laws of the State of New York on or about March 9, 2004. Golub is the sole officer of ARGPC

which is engaged in the practice of law before the courts of the State of New York.

       3.     Hollywood Gang Productions, LLC ("HGP") is, and at all times relevant

hereto was, a limited liability company duly organized under the laws of the State of Delaware and having its principal place of business, and authorized to conduct business, in the State of California. Upon information and belief, HGP is believed to be a loan out company and is and was at all material times engaged in the business of developing and producing motion pictures, and is a company through which Gianni Nunnari ("Nunnari") renders and rendered services as a motion picture producer.

4.      Nunnari is the founding member of HGP, its Managing Member and owns the majority, if not all, of the membership interests in HGP and controls HGP. HGP:

      i.      Exists as an agency, conduit, extension and/or de facto of Nunnari;

     ii.      Never had, and does not now have, any genuine or separate corporate existence, but has been used and exists for the sole or dominant purpose of permitting defendant Nunnari:

        (a)      To transact a portion or all of his individual business under a corporate guise; and

        (b)      Unjustly attempt to shield himself from prospective liability.

5.      At all relevant times, Nunnari wholly controlled and continues to control the actions, activities and policies of HGP. Nunnari and HGP, in the facts, actions, events, agreements and contracts set forth below are the alter ego of each other and/or act as one single entity.

## JURISDICTION AND VENUE

6.      This is a civil action over which this Court has original jurisdiction under the provisions of 28 U.S.C § 1332(a)(1), the diversity jurisdiction statute.

7.      Plaintiffs, both citizens of New York, assert claims arising from fraud

and/or fraudulent inducement by the Defendant which is a citizen of Delaware. Complete diversity exists between the parties in this action.

8.      The amount in controversy is in excess of the statutory minimum of seventy-five thousand dollars ($75,000.00).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Defendant is subject to personal jurisdiction in this District.

## BACKGROUND

10.      Nunnari is a resident of the County of Los Angeles, State of California. At all relevant times, Nunnari is and was a producer of motion pictures and was the President of Cecchi Gori Pictures ("CGP") and Cecchi Gori USA ("CGUSA") from in or about 1996 to in or about April, 2008. Upon information and belief, CGUSA is the successor company to Cecchi Gori Group Europa N.V. ("CGGE"). At all relevant times, Vittorio Cecchi Gori ("VCG") is and was the beneficial owner of CGP and CGUSA. At all relevant times, VCG is and was an Italian motion picture producer doing business through various corporations under the Cecchi Gori name (collectively Cecchi Gori Group ("CGG")).

11.      In or about July, 2002, Nunnari contacted Golub. Nunnari represented to Golub, *inter alia*, that: he was a dutiful and loyal employee; was not in breach of any agreements, including without limitation, employment agreements, with VCG and CGP; VCG and CGP had no defenses to Nunnari's claims; and Nunnari had not engaged in corporate misconduct.

12.      In or about August, 2002, Plaintiff Golub was personally retained by Nunnari regarding New York and International law.

13.     Relying upon the aforementioned express representations by Nunnari to Golub, Golub entered into a retainer agreement with Nunnari dated August 29, 2002 ("2002 Retainer").

14.     In or about 2003, HGP by Nunnari, and others on HGP's behalf, represented to Golub, *inter alia*, that his company HGP controlled, as optionee, any and all rights of CGUSA and other entities in CGG, to all motion picture, television and allied rights in the novel entitled "Silence" written by Shusaku Endo, having legally acquired the foregoing rights from CGUSA.  HGP by Nunnari, represented to Golub that on May 1, 2001, Nunnari's company HGP optioned the rights to "Silence" from CGUSA pursuant to an "Option/Assignment Of Rights Agreement Made And Entered As Of May 1, 2001" which HGP by Nunnari unequivocally represented was signed by an authorized agent of VCG and allegedly approved by VCG personally ("2001 Silence Option Agreement") (Exhibit 2).  Unbeknown to Plaintiffs, the purported authorized agent of VCG who signed the 2001 Silence Option Agreement was Roland Lilavois who was dominated and controlled by Nunnari and actually was performing services for HGP and Nunnari personally.

15.     Upon information and belief, much earlier in 1998, after CGGE acquired the rights to "Silence," the internationally acclaimed director Martin Scorsese ("Scorsese") and Scorsese's then loan out company Cappa Productions, Inc. ("CPI") signed agreements with CGGE agreeing, *inter alia*, that Scorsese would direct Silence as his third motion picture after directing the motion picture entitled "Kundun" and to submit a completed screenplay, budget and list of cast members for "Silence" ("Scorsese Agreements").  CGUSA succeeded CGGE's rights concerning "Silence."

– 4 –

16.     Scorsese finished directing "Kundun" in 1997.  The next feature length movie directed by Scorsese was "Bringing Out the Dead" in 1998/1999.  The second feature length movie directed by Scorsese following "Kundun" was "Gangs of New York" in 2001/2002. Thus, no later than 2002, when Scorsese finished directing "Gangs of New York", Scorsese was obligated to produce and direct "Silence" and submit to HGP a completed screenplay, budget and list of cast members for "Silence," by December 1, 2002.  Instead, Scorsese commenced directing the motion picture entitled "The Aviator."   HGP claimed that Scorsese breached the Scorsese Agreements.

17.     Relying upon the aforementioned express representations of HGP by Nunnari and others on HGP's behalf, to Golub concerning the "2001 Silence Option Agreement," set forth in paragraphs 14-16 above, Golub agreed to represent HGP in New York concerning its claims related to the motion picture "Silence."

18.     HGP signed a retainer agreement with Golub dated April 4, 2003 ("2003 Retainer"), which provides, in pertinent part, the following:

> "I will represent HGP [Hollywood Gang Productions, LLC] with regard to HGP's claims against the above captioned individuals and entities concerning the literary property entitled 'Silence' and related movie rights."

19.     Pursuant to the 2003 Retainer, Plaintiff Golub commenced an action on or about May 9, 2003, in the Supreme Court of the State of New York, County of New York, captioned Hollywood Gang Productions, LLC v. Cappa Productions, Inc., formerly known as Scorsese Productions, Inc., Martin Scorsese, Jay Cocks, Initial Entertainment Group, Inc., Warner Bros. Pictures, Inc., Miramax Film Corp., Forward Pass, Inc., and John Does 1-10, New York County Index No. 6014691/2003 (the "2003 Action").

-5-

20.     Upon information and belief, at all relevant times, Martin Scorsese ("Scorsese") was and is the sole and/or controlling shareholder of Cappa Productions, Inc. ("CPI").  At all relevant times, Scorsese resided and conducted business in the City, County and State of New York and currently resides and conducts business in the City, County and State of New York.

21.     Upon information and belief, the successor-in-interest to CPI is Sikelia Productions, Inc. ("SPI") which, upon information and belief is a corporation duly organized under the laws of the State of Delaware.  Upon information and belief, at all relevant times, CPI conducted business in the City, County and State of New York with a principal place of business at 445 Park Avenue, New York, New York.

22.     After the 2003 Action was commenced by Golub and as a further inducement for Golub to continue litigating the 2003 Action, HGP by Nunnari further represented to Golub and produced to Golub a May 22, 2003 letter (Exhibit 3), which HGP by Nunnari and others represented was signed by VCG, confirming that the 2001 Silence Option Agreement was valid.

23.     Golub, in addition to litigating the 2003 Action, successfully negotiated an extremely favorable settlement agreement in favor of HGP in the 2003 Action, dated as of February 12, 2004 (the "Scorsese Settlement").  The Scorsese Settlement was amended from time to time as a result of Scorsese postponing his obligations to direct "Silence."  Golub's agreement with HGP, and as amended by written agreement dated June 27, 2007 between ARGPC and HGP, entitled Golub and ARGPC to certain percentages (2.5% to 30%) of sums paid or to be paid to HGP pursuant to the Scorsese Settlement and the amendments to the

Scorsese Settlement.

24.     On or about May 6, 2008, Nunnari and HGP commenced an action in the Superior Court for the State of Los Angeles, County of Los Angeles, captioned <u>Gianni Nunnari, an individual, and Hollywood Gang Productions, LLC, a California limited liability company v. Cecchi Gori Pictures, a California corporation; Cecchi Gori USA, Inc., a California corporation; Vittorio Cecchi Gori, an individual; Lourdes Blasco, an individual; and DOES 1 through 10, inclusive</u>, Los Angeles County Index No. BC390245 ("Nunnari v Gori Action").  The Nunnari v Gori Action alleged causes of action for, *inter alia*, wrongful termination and claimed more than $2.5 million in damages.

25.     On or about June 5, 2008, CGP and CGUSA, Inc. filed a cross-complaint in Superior Court for the State of Los Angeles, County of Los Angeles against the plaintiffs in the Nunnari v. Gori Action, captioned <u>Cecchi Gori Pictures, a California corporation; Cecchi Gori USA, Inc., a California corporation v. Gianni Nunnari, an individual and Hollywood Gang Productions, LLC, a California limited liability company</u>.  ("Gori v. Nunnari Action").  The Gori v. Nunnari action alleged causes of action for, *inter alia*, breach of fiduciary duties and fraud.

26.     The Honorable Judge Amy D. Hogue presided over a bench trial in the Nunnari v Gori and Gori v Nunnari Actions from June 8, 2010, to July 2, 2010.  As set forth in Judge Hogue's "Statement of Decision Following Bench Trial" dated March 25, 2011 in the Nunnari v. Gori and Gori v Nunnari Actions annexed hereto as Exhibit 1 ("Decision" or "Ex. 1"), the lawsuits arose out of the breakdown of a 25 year friendship and employment relationship between VCG and Nunnari, who at that time was President of two Cecchi Gori companies in Los Angeles, viz., CGP and CGUSA.

27.     The Decision states that according to VCG, the relationship sharply deteriorated in 2006, after VCG visited CGP's Los Angeles office, unannounced, and discovered that Nunnari was using CGP's Los Angeles office to operate his own company HGP.  By April 2008, VCG came to the conclusion that Nunnari was using CGP employees, assets and corporate opportunities to advance HGP's motion picture development and production business in direct competition with CGP and CGUSA.  On April 7, 2008, VCG, through his California counsel, closed the Los Angeles office, evicted Nunnari and HGP therefrom, and terminated most of the CGP and CGUSA employees.  The Nunnari v Gori and Gori v. Nunnari Actions ensued (Ex.1 p. 5)

28.     The Decision (Findings of Fact) references approximately 50 instances enumerated below in which Nunnari "engaged in constructive fraud, concealment, and breach of his employment agreements" (Ex. 1 p. 35), essentially committed perjury and embezzlement, which Nunnari committed de facto.  Nunnari and HGP failed to perfect and complete their appeal from the Decision, *a fortiori*, all fact findings in the Decision are collaterally estopped from being disputed.  Judge Hogue repeatedly cited Nunnari's lack of credibility in her Decision and its fact findings made clear that Nunnari's actions were tainted by moral turpitude and demonstrate Nunnari's criminal indifference to civil obligations, including, but not limited to the following:

**A.     Nunnari's Judicially Determined Persistent Pattern
of Untruthfullness and Deception All of Which
Had Their Genesis Prior to the 2002 and 2003 Retainer Agreements**

### CREDIBILITY

1.     "The **court did not believe Nunnari's testimony** that he sent VCG a copy of Miller's graphic novel, 300, invited VCG to invest in the project,

informed him that HGP obtained rights to shop the project etc." (Ex. 1 p. 37);

2.    "**Putting aside Nunnari's credibility as a witness**, . . ." (Ex. 1 p. 38);

3.    "Testimony from producer Carlo Carlei **raises questions about Nunnari's credibility** on this point." (Ex. 1 p. 20, footnote 3);

4.    "His [Alatan] testimony about Nunnari's contemporaneous statements **undermines Nunnari's rendition of events**." (Ex. 1 p. 28);

5.    "VCG's testimony with respect to the alleged oral agreement is **more credible than Nunnari's** for several additional reasons." (Ex. 1 p. 29);

6.    "**vitiates his [Nunnari's] contention that he acted in good faith**." (Ex. 1 p. 38);

7.    "His candid admission in a June 28, 2008 email-- that **he only cares about credit, position and money- better explains, and is more consistent with, his decisions** whether to advance the projects under the HGP or CGP name." (Ex. 1 p. 18);

8.    " . . . **no corroborating evidence** that the parties ever discussed this issue [release from VCG] or that it was negotiated . . . " (Ex. 1 p. 24);

9.    "With **Nunnari a key player in CGG's ongoing financial crises** . . ." (Ex. 1 p. 24).

**B.    Nunnari's Judicially Determined Fraud, Constructive Fraud, Perjury, Concealment, Breaches of Fiduciary Duties, Breaches Of His Employment Agreements, and Embezzlement, All Of Which Had Their Genesis Prior to the 2002 and 2003 Retainer Agreements**

1.    Nunnari breached his "fiduciary duty to act loyally for their [Nunnari's employer's] benefit on all matters connected with his employment" (Ex. 1 p. 33);

2.    Nunnari "engaged in constructive fraud, concealment, and breach of his employment agreements" (Ex. 1 p. 35);

3.    While "Nunnari and other CGP employees were being paid to develop the former PentAmerica projects and other projects for CGP from 1996 through April 7, 2008, they performed the same functions, often on the

same projects, for the benefit of HGP" (Ex. 1 p. 35);

4.      Nunnari acted "in a direct conflict of interest with his employers" (Ex. 1 p. 36);

5.      Nunnari breached his "duty not to acquire any material benefit from a third party in transactions he conducted on behalf of CGP and CGUSA, or otherwise through the use of his positions at CGP and CGUSA" (Ex. 1 p. 33);

6.      Nunnari "took steps to conceal HGP's activities from Rome and carefully monitored whether office correspondence went out under CGP or HGP letterhead" (Ex. 1 p. 17);

7.      Nunnari "used CGP letterhead on initial correspondence soliciting interest in CGP projects and switched to HGP letterhead after the CGP addressee expressed interest in working on the project" (Ex. 1 pp. 17-18);

8.      Nunnari engaged in unlawful concealment as "HGP was concealing its activities from Rome" (Ex. 1 p. 25);

9.      Nunnari attempted to convert, or in fact, embezzle $520,062 and other sums from his employer by "fail[ing] to present sufficient evidence to prove that CGP was obligated to reimburse the $520,062 he [Nunnari] paid to CGP… [CGP's] expert accountant, Jan Goren, examined CGP's general ledger and identified detailed postings, as of December 31, 2005, confirming that Nunnari owed CGP $520,062.  After reviewing the source documents, Goren concluded that the sum represented CGP's accumulated advances for expenses incurred by HGP… [CGP] proved that Nunnari paid this money to CGP to satisfy a valid obligation - an obligation owed since December 2005." (Ex. 1 pp. 46-47);

10.     Nunnari breached his "duty not to take personal advantage of any opportunity to maintain, buy, sell, and develop film projects for CGP and CGUSA" … "that arose in the course of that work and not to offer the opportunity to a third party, such as [plaintiff's company Hollywood Gang Productions, LLC] HGP" (Ex. 1 p. 33);

11.     Nunnari breached the prohibition against "taking personal advantage" of his position "in the form of direct benefits, such as pecuniary gain" (Ex. 1 p. 33);

12.     Nunnari breached the prohibition against "taking personal advantage" in the form of "indirect benefits that enhance reputation, such as on-screen

-10-

'producer' titles" (Ex. 1 p. 26-27, 30);

13.     Nunnari breached his "duty not to deal with his employees as, or on behalf
        of, HGP (or any other adverse party) in transactions relating to his
        employment" (Ex. 1 p. 33);

14.     Nunnari breached his duty to "deal fairly with VCG [Vittorio Cecchi Gori]
        and [VCG's] companies" in transactions between CGP/CGUSA and HGP
        or other third parties (Ex. 1 p. 34);

15.     Nunnari breached his "duty to refrain from competing with VCG and his
        companies" (Ex. 1 p. 34);

16.     Nunnari breached his duty to refrain "from taking action on behalf of, or
        otherwise assisting, HGP or any other competitor" of CGP and CGUSA
        (Ex. 1 p. 34);

17.     Nunnari "focused HGP's business on development of motion picture
        projects - CGP's core business" (Ex. 1 p. 13);

18.     Nunnari breached his duty to "deal with his employers in good faith" (Ex.
        1 p. 34);

19.     Nunnari breached his duty to "disclose to VCG that (i) he [plaintiff] was
        also acting for HGP" (Ex. 1 p. 34);

20.     Nunnari breached his duty to disclose to VCG "all other facts that he knew
        or should have known would affect VCG's judgment" (Ex. 1 p. 34);

21.     Nunnari failed to make "transaction-by-transaction disclosures to anyone"
        in a position at VCG's companies "to recognize and act on his conflicts of
        interest regarding CGP and/or CGUSA" (Ex. 1 p. 35);

22.     Nunnari breached his "duty not to use CGP's or CGUSA's property
        (including their work product and confidential information), for his own or
        HGP's purposes" (Ex. 1 p. 34);

23.     Nunnari breached his "duty to use of the office and employees for his
        employers' benefit" (Ex. 1 p. 34).  "[I]nstead of working on
        CGP/CGUSA's motion picture business, [VCG's] top employees in Los
        Angeles were pursuing the very same business on their own account." (Ex.
        1 p. 16);

24.     Nunnari negotiated "agreements [which] yielded more compensation for

-11-

HGP (in production fees and other compensation) than to CGUSA (for sale of its rights in development projects)" (Ex. 1 p. 36);

25.  Nunnari did not adequately disclose to VCG, "HGP's real business plan" (Ex. 1 p. 16);

26.  Nunnari was impermissibly "negotiating with third parties as a dual agent for HGP and CGP" (Ex. 1 p. 30);

27.  Nunnari "failed to demonstrate disclosure to and consent from VCG or any other person in the [VCG's] organization who had authority to recognize the conflict of interest in his [plaintiff's] producer agreements and take action on it" (Ex. 1 p. 37);

28.  VCG "had no idea that Nunnari [plaintiff] was operating HGP out of CGP's offices or that they [plaintiff and HGP] were competing with his [VCG's] companies in the motion picture development business" (Ex. 1 p. 23);

29.  Nunnari concealed from VCG plaintiff's dual agency role concerning the following motion pictures: Ferrari, Silence, and Everybody's Fine (Ex. 1 p. 37);

30.  "Without any disclosure to VCG or GCC in Rome, Nunnari [plaintiff] negotiated with Disney both as President of CGP (representing CGGE [Cecchi Gori Group Europa N.V.]) and as the managing member of HGP" (Ex. 1 p. 13);

31.  "As CGP's top creative executive, Nunnari's [plaintiff's] negotiation for his compensation" for his role as creative producer for Ferrari "was a conflict of interest and a breach of his fiduciary duties" (Ex. 1 p. 14);

32.  With respect to "CGUSA's transfer of its intellectual property interest in Silence to HGP", Nunnari convinced "VCG that Nunnari [plaintiff] should be fully empowered to act for CGP when VCG was unavailable" (Ex. 1 p. 19);

33.  Nunnari did not disclose to VCG that one of Nunnari's subordinate's transferred "an option on CGUSA's rights in Silence to HGP for a nominal sum" (Ex. 1 p. 19);

34.  "CGP… received nothing for the time that its employees worked on HGP's behalf" (Ex. 1 p. 26);

35.     Nunnari "was unable to produce original signed versions of agreements and correspondence critical to his case such as the 2001 HGP Option on Silence and VCG's May 7, 2003 letter ostensibly ratifying that option" (Ex. 1 p. 32);

36.     Nunnari "was an undisclosed dual agent with respect to the 2001 Option on Silence" (Ex. 1 p. 49);

37.     Nunnari "(CGUSA) negotiated an option that gave Miramax the remake rights" in Everybody's Fine "in exchange for immediate payment of $5,000 to CGUSA against a total purchase price of $1,013,590 (the amount of CGUSA's investment in the project to date)" while securing the huge sum of "$610,000 to HGP in producer fees, additional contingent compensation up to $225,000…, and [movie] credits for himself, as producer, and [HGP employee] Craig Flores, as 'executive producer'" (Ex. 1 p. 30);

38.     "VCG's claims against Nunnari/HGP remained unresolved" (Ex. 1 p. 31);

39.     Nunnari "failed to disclose to VCG that he was dealing with Miramax on his own account and on behalf of CGP/CGUSA" (Ex. 1 p. 46);

40.     Nunnari's "work developing and producing 300 placed him in a conflict of interest with his employers" (Ex. 1 p. 37);

41.     Nunnari never "disclosed [to VCG] the terms of any prospective agreements that he or HGP entered into with respect to 300 or disclosed that CGP employees were working on the project" on Nunnari's behalf (Ex. 1 pp. 21-22);

42.     Nunnari "apparently concealed, from [producer Mark] Canton, his dual roles in HGP and the VCG entities." (Ex. 1 p. 22);

43.     Nunnari "used CGP's office and employees to work on film development projects that benefited Nunnari [plaintiff] and HGP rather than CGP or CGUSA" (Ex. 1 pp. 41-42);

44.     Nunnari "was using CGP employees and assets to develop competing projects and concealing its [HGP's] activities from Rome" where VCG and his companies are located (Ex. 1 p. 25);

45.     Nunnari directed "people on CGP's payroll" "to work on developing motion picture projects for CGP and for HGP out of CGP's Los Angeles Office" (Ex. 1 p. 16).   After Claire Ambrosio was hired as General

Counsel and Vice President of Business Affairs for CGP/CGUSA, Nunnari "directed her to work for HGP as well" even though her employment agreement specified that she was "employed to service several CGP entities (Ex. 1 p. 17);

46.     "HGP was garnering profits on projects serviced by CGP employees" (Ex. 1 p. 25);

47.     Nunnari breached his employment agreements (Ex. 1 p. 35);

48.     Nunnari was a "key player in CGG's [Cecchi Gori Group's] ongoing financial crises (Ex. 1 p. 24); and

49.     Nunnari made a "candid admission in a June 28, 2008 e-mail-that he only cares about credit, position and money-better explains, and is more consistent with, his decisions whether to advance the [movie] projects under the HGP or CGP name" (Ex. 1 p. 34).

29.     Moreover, Judge Hogue held that Nunnari and HGP acquired **no** rights to "Silence" under the 2001 Silence Option Agreement and VCG did **not** sign the May 23, 2003 letter ratifying HGP's rights under the 2001 Silence Option Agreement, as follows (Ex. 1 pp. 26 and 44):

"Neither side produced a signed original of this [May 23, 2003] letter. Although VCG admitted that the signature looks like his signature, **VCG adamantly denied ever seeing or signing the May 22, 2003 letter**.

. . .

The court has found that there is a present and adjudicable controversy with respect to Defendants' [VCG, CGP and CGUSA's] claim of ownership rights in Silence. **The court finds and declares that Nunnari and HGP acquired no intellectual property rights in Silence under the 2001 HGP Option**. Defendants proved, by a preponderance of the evidence, that Nunnari acted as a dual agent and executed the 2001 HGP Option without the necessary disclosures to and consent from VCG. **Plaintiffs [Nunnari and HGP] failed to establish that Roland Lilavois, the CGUSA officer who signed the 2001 HGP Option, had the requisite authority to recognize or consent to Nunnari's conflict of interest**. To the contrary, the evidence was that Lilavois was Nunnari's subordinate and acted at his direction. **Defendants also proved that VCG did not sign the May 23, 2003 letter purporting to ratify HGP's rights under the 2001 HGP Option.**

-14-

**The 2001 HGP option is therefore void and/or subject to forfeiture of any and all benefits obtained under its provisions.** To ensure that CGUSA reaps all past and future benefits flowing from its ownership rights in Silence, **the court will impose a constructive trust on any and all proceeds flowing from Nunnari and/or HGP's exercise of ownership rights under the invalid 2001 HGP Option**" (emphasis supplied) (Ex. 1 pp. 26 and 44).

30.    Accordingly, any and all documents offered by HGP under the aegis of Nunnari, were given to Plaintiffs upon which Plaintiffs reasonably and justifiably relied to commence and continue the litigation on behalf of HGP. At all relevant times, the foregoing unlawful acts by Nunnari were concealed by Nunnari from Plaintiffs prior to, at the time of, and after Plaintiffs entered into the 2003 Retainer and the 2003 Retainer as amended and the 2002 Retainer. Plaintiffs, believing in the truth of HGP's by Nunnari's statements and representations concerning the 2001 Silence Option Agreement, and in reliance upon those statements and representations, was thereby fraudulently induced to enter into the 2003 Retainer with HGP and the 2003 Retainer as amended, which Plaintiffs would not have done and nor would Plaintiffs have continued to represent HGP thereafter, had Plaintiffs known the truth of the matter and accordingly have been damaged.

31.    Plaintiffs, believing in the truth of HGP by Nunnari's statements and representations concerning the May 22, 2003 letter and in reliance upon those statements and representations, was thereby fraudulently induced to continue litigating the 2003 Action and to continue representing HGP, which Plaintiffs would not have done had Plaintiffs known the truth of the matter and accordingly have been damaged.

32.    Moreover, as a result of the foregoing judicial determination by Judge Hogue that, *inter alia*, the 2001 Silence Option Agreement is void and/or subject to forfeiture of

any and all benefits obtained under its provisions, HGP will no longer pay Plaintiffs sums they would have been owed pursuant to the Scorsese Settlement and the 2003 Retainer and the 2003 Retainer as amended and accordingly have been damaged.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Fraud and/or Fraudulent Inducement)

33.     Plaintiffs repeat and reallege each of the foregoing allegations as if fully set forth herein.

34.     During Plaintiffs' negotiation of the 2002 Retainer and the 2003 Retainer and the 2003 Retainer as amended, and prior to and following the execution thereof, Defendants deliberately and intentionally withheld material information from Plaintiffs, actively concealing from Plaintiffs, Nunnari's *inter alia*, fraud, constructive fraud, concealment, breach of employment agreements, forgery, perjury and embezzlement.

35.     Defendant and Nunnari knew that their concealments, omissions and misrepresentations, as stated in paragraphs 14, 17, 22, 28-31 above, were material and that, by deliberately concealing and/or misrepresenting such information, any reasonable attorney would be secure in the merits of Defendant's claims against, and would be willing to represent Defendant concerning its claims against, VCG, CGP and CGUSA.

36.     Defendant and Nunnari were so eager to have Plaintiffs represent Defendant, that Defendant by Nunnari would have said, and expressly concealed, misrepresented or done anything to induce Plaintiffs to represent Defendant.  Defendant by Nunnari recklessly and/or intentionally concealed and/or misrepresented their relationship with VCG, CGP and CGUSA to Plaintiffs with a willful and conscious disregard to their falsity and omissions and

with the intent that Plaintiffs rely on such misrepresentations and omissions and thus be induced into entering into retainer agreements with Defendant.

37. Defendant intended for Plaintiffs to rely on their aforesaid false representations, concealments, omissions and misrepresentations and the reasonable inferences drawn therefrom, and as a result of such reliance, to be induced into entering into retainer agreements with Defendant. Plaintiffs actually and justifiably and to their detriment relied on Defendant's false representations, concealments, omissions and misrepresentations and the reasonable inferences drawn therefrom and in such reliance upon those false representations, concealments, omissions and misrepresentations and the reasonable inferences drawn therefrom, Plaintiffs were thereby fraudulently induced to enter into the 2002 Retainer and the 2003 Retainer and as amended in 2007.

38. If Plaintiffs had known of Defendant by Nunnari's dishonest, unlawful and nefarious business practices, fraud, constructive fraud, concealments, and breaches of fiduciary duties and breaches of employment agreements, then Plaintiffs never would have entered into the retainer agreements with Defendant or continued in the legal representation of Defendant and/or to associate with Defendant and Nunnari.

39. As a direct and/or proximate result of Plaintiffs' reliance, Plaintiffs have been severely damaged, such damage including without limitation the loss of substantial legal contingency fees.

40. Defendant's actions were taken knowingly, intentionally and/or otherwise recklessly with a callous disregard for Plaintiffs' rights.

41. As a result of the foregoing, Plaintiffs have been irreparably harmed and

-17-

are entitled to damages from Defendant, for an amount to be determined at trial in excess of One Hundred Thousand Dollars ($100,000.00) plus legal interest, and are further entitled to exemplary damages in a sum in excess of Twenty Million Dollars ($20,000,000.00).

**WHEREFORE**, Plaintiffs respectfully request the Court enter a judgment as follows:

i.      On the First Cause of Action against Defendant, for an amount to be determined at trial in excess of One Hundred Thousand Dollars ($100,000.00) as well as exemplary damages in a sum in excess of Twenty Million Dollars ($20,000,000.00), plus appropriate interest thereon;

ii.      Granting to the Plaintiffs such other and further relief as this Court shall deem just and proper, together with the costs and disbursements of this action, and reasonable attorneys' fees.

Dated: New York, New York
           February 11, 2013

Respectfully submitted,

AARON RICHARD GOLUB, ESQUIRE

s/ Aaron Richard Golub
By: Aaron Richard Golub
Attorney for Plaintiffs
34 East 67th Street – 3rd Floor
New York, New York 10065
ph: 212-838-4811
fx: 212-838-4869
e-mail: argolub@argolub.com
ARG 6056

-18-

## JURY DEMAND

Plaintiffs, by their attorney, AARON RICHARD GOLUB, ESQUIRE, hereby demand

trial by jury of all claims so triable pursuant to FRCP 38.

Dated: New York, New York
       February 11, 2013

                            Respectfully submitted,

                            AARON RICHARD GOLUB, ESQUIRE

                            s/ Aaron Richard Golub
                            By: Aaron Richard Golub
                            Attorney for Plaintiffs
                            34 East 67th Street – 3rd Floor
                            New York, New York 10065
                            ph: 212-838-4811
                            fx: 212-838-4869
                            e-mail: argolub@argolub.com
                            ARG 6056

**Exhibit 1**

34

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

MAR 25 2011

John A. Clarke, Executive Officer/Clerk

By_____ Deputy
KAREN TAPPER

# SUPERIOR COURT FOR THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

Gianni Nunnari et al.,

         Plaintiffs,

    vs.

Checchi Gori. et al.,

         Defendants

And Related Cross Action

Case No.: BC390245

Statement of Decision Following Bench Trial.

# Table of Contents

I.   Summary of Pertinent Evidence. .......................................................................6

  A.  VCG's Father Takes Nunnari under His Wing.....................................................6

  B.  VCG Forms PentAmerica to Develop and Produce Motion Pictures in the U.S....7

  C.  VCG's Distribution Business Takes Off in the Mid-1990s. ...............................10

  D.  VCG Allows Nunnari to Works as a Producer-for-Hire on Seven.......................12

  E.  HGP Negotiates Directly with Disney for Nunnari's Producer Services on Ferrari.
     13

  F.  Nunnari Proposes Terms for a Written Employment Agreement with CGP. .......14

  G.  Nunnari Expands His Staff in Los Angeles. ........................................................16

  H.  Nunnari and his Subordinate Execute an Option Conveying CGUSA's Rights in
  Silence to HGP ....................................................................................................18

  I.  HGP Develops and Produces 300. ....................................................................20

  J.  VCG and Nunnari Negotiate the 2003 Employment Agreement. .......................22

  K.  Nunnari Hires Flores as General Counsel and Sues Scorsese...........................25

  L.  VCG Extends Nunnari's Employment for Two More Years.................................27

  M.  Nunnari Continues to Work for VCG and Negotiates for CGUSA and HGP on
  Everybody's Fine. .................................................................................................28

  N.  VCG Closes CGP's and CGUSA's Los Angeles Office........................................31

II.   The Evidence Supports a Decision in Favor of Defendants on their Cross
Complaint. ..................................................................................................................32

  A.  Nunnari Owed Several Discrete Fiduciary Duties to his Employers, CGP and
  CGUSA.................................................................................................................32

B.   Nunnari Breached his Employment Agreements, Breached Fiduciary Duties, and Engaged in Concealment and Constructive Fraud. .................................................34

    1.   Nunnari's Work Developing and Producing Motion Pictures for HGP Violated Fiduciary Duties Owed to CGP and CGUSA. ..........................................35

    2.   Nunnari's Failure to Disclose His Dual Agency and Proposed Transactions as a Dual Agent Was in Breach of His Fiduciary Duties. ...............................36

    3.   VCG's Agreement that Nunnari Could Work as a "Producer-for-Hire" Was Not a Waiver of Nunnari's Obligation to Place his Employers' Interests Ahead of his Own. ............................................................................39

    4.   The 2003 Employment Agreement Does Not Bar Defendants' Claims. ..........40

    5.   Nunnari Also Breached Duties by Using CGP and CGUSA Employees and Assets for His Own Benefit. ...............................................................41

C.   Defendants (Prove ~~FAILED TO~~ Breach of Duty, Breach of Contract, and other Tortious Conduct with Respect to Immortals/War of Gods. ...............................................42

*III.*   *There Is Insufficient Evidence of a Current and Justiciable Controversy over Ownership of Any Project other than Silence.* ...............................................45

IV.   Legal Analysis of Nunnari's Complaint...............................................46

A.   Nunnari Cannot Prevail on his Breach of Contract, Fraud, or Promissory Estoppel Claims because There Is No Credible Evidence that VCG Promised to Extend the 2005 Agreement or Pay Severance.........................................................46

B.   Nunnari's Interference with Economic Advantage Claim Fails............................46

C.   Nunnari Failed to Prove Breach of Contract, Conversion, and Claim and Delivery. 46

V.   Remedies...............................................................................48

A.   Damages ...............................................................................48

B.   Accounting ................................................................................ 48

C.   Injunction .................................................................................. 49

D.   Constructive Trust...................................................................... 49

E.   CGUSA Owns all Intellectual Property Rights in Silence Ostensibly Conveyed under the 2001 HGP Option Agreement. ............................................................. 49

F.   There Is No Present Claim or Controversy to Adjudicate with Respect to Ownership of other Film Projects.................................................. 50

This action arises out of the breakdown of a 25 year friendship and employment relationship between Vittorio Cecchi Gori (VCG), an Italian motion picture producer doing business through various corporations under the Cecchi Gori name (collectively Cecchi Gori Group ("CGG")), and Gianni Nunnari, who served as President of two Cecchi Gori companies in Los Angeles: Cecchi Gori Pictures, Inc. ("CGP") and Cecchi Gori USA, Inc. ("CGUSA").

According to VCG, the relationship sharply deteriorated in 2006, after VCG visited CGP's Los Angeles office, unannounced, and discovered that Nunnari was using CGP's Los Angeles office to operate his own company, Hollywood Gang Productions, LLC ("HGP"). By April 2008, VCG came to the conclusion that Nunnari was using CGP employees, assets and corporate opportunities to advance HGP's motion picture development and production business in direct competition with CGP and CGUSA. After consulting with CGP's former General Counsel, Claire Ambrosio, VCG decided to close down the Los Angeles office. Nunnari was en route to a filming in Connecticut when, on April 7, 2008, VCG's attorney, William Moore, terminated most of the CGP and CGUSA employees, including CGP's General Counsel, Craig Flores.

Nunnari and HGP (collectively "Plaintiffs") filed this action against VCG, CGP and CGUSA alleging wrongful termination and claiming more than $2.5 million in damages.[1] CGP and CGUSA (collectively "Defendants") cross-complained against Nunnari and

---

[1] Nunnari's First Amended Complaint alleges: (1) breach of contract (Nunnari vs. CGP, CGUSA); (2) fraud (Nunnari vs. VCG, CGP and CGUSA); (3) promissory estoppel (Nunnari, HGP vs. CGP, CGUSA); (4) conversion (Nunnari, CGP vs. VCG, CGP, CGUSA); (5) claim and delivery (Nunnari, HGP vs. VCG, CGP, and CGUSA); (6) intentional interference with economic advantage (Nunnari, HGP vs. VCG, CGP, CGUSA); (10) breach of contract (reimbursement) (HGP vs. CGP, CGUSA); (11) accounting (HGP vs. CGP, CGUSA); and (13) declaratory relief (Nunnari, HGP vs. VCG, CGP, CGUSA).

HGP for alleged breach of fiduciary duties, fraud and other claims.[2]  All parties waived

their rights to a jury trial and presented evidence in a court trial from June 8, to July 2,

2010.

Although the long course of dealing among the parties is factually complex, the

principles of agency law that govern the case are axiomatic and well established.  As

explained more fully below, the court finds that Defendants proved several claims

alleged in their Cross-complaint by a preponderance of the evidence, and finds that

Plaintiffs failed to prove, by a preponderance of evidence, the claims alleged in their

Complaint.

# I.  Summary of Pertinent Evidence.

## A. VCG's Father Takes Nunnari under His Wing.

Mario Cecchi Gori was a pioneer in the Italian film business who produced more

than 200 motion pictures in Italy.  He brought his son, VCG, into the business, and they

worked together for many years, developing and producing motion pictures under the

Cecchi Gori banner.

---

[2] CGP and CGUSA's First Amended Cross-complaint alleges (1) breach of employment contract (CGP vs. Nunnari); (2) breach of fiduciary duty (CGP, CGUSA vs. Nunnari, HGP); (3) constructive fraud (CGP, CGUSA vs. Nunnari, HGP); (4) fraudulent concealment (CGP, CGUSA vs. Nunnari, HGP); (5) breach of loyalty (CGP, CGUSA vs. Nunnari, HGP); (6) conversion (CGP, CGUSA vs. Nunnari, HGP); (7) unfair business practice (CGP, CGUSA vs. Nunnari, HGP); (8) unjust enrichment (CGP, CGUSA vs. Nunnari, HGP); (9) accounting (CGP, CGUSA vs. Nunnari, HGP); (10) declaratory relief (CGP, CGUSA vs. Nunnari, HGP); and (11) declaratory relief (CGP, CGUSA vs. Nunnari, HGP).  In the course of trial, Defendants abandoned their conversion and unfair business practices claims.  As a matter of law, the court finds the unjust enrichment and accounting causes of action are not actionable because they assert remedies rather than causes of action.  The court finds the eleventh cause of action for declaratory relief duplicative of the other properly pled claims.  The fifth cause of action for breach of loyalty likewise duplicates the second cause of action for breach of fiduciary duty.

6

From an early age, Nunnari aspired to become a motion picture producer and idolized Mario Cecchi Gori. Like VCG, he worked in his father's business in Italy, which involved purchasing motion pictures, including CGG motion pictures, for distribution in Greece. Nunnari was only 23 years old when his father passed away. Mario made a promise to Nunnari's father that he would look after Nunnari and followed through on that promise by employing Nunnari in various CGG companies. After Mario died years later, VCG continued to employ Nunnari in positions that allowed him to learn the motion picture production and distribution business in Italy. Nunnari excelled in these positions and became one of VCG's closest friends and most trusted confidants.

## B. VCG Forms PentAmerica to Develop and Produce Motion Pictures in the U.S.

Nunnari's self-taught fluency in English was one of many reasons why VCG sent Nunnari to Los Angeles in the late 1980s to spearhead CGG's acquisition of the rights to distribute U.S. motion pictures in Italy. Soon after Nunnari arrived, VCG and Italian businessman Silvio Berlusconi formed Penta Pictures, Inc. (later known as PentAmerica Communications, Inc,)(collectively "PentAmerica"), a joint venture charged with continuing CGG's distribution business and developing and producing motion pictures in the United States. By this time, Nunnari aspired to be a U.S. motion picture producer and got his first taste of that business as President of PentAmerica. As Nunnari explained at trial, Berlusconi's money made PentAmerica a serious Los Angeles company with a mandate to buy and also produce movies.

Nunnari signed a written employment agreement with PentAmerica.  For his exclusive services as President, PentAmerica agreed to pay $250,000 in annual salary and a producer fee -- $100,000 per film the first year and $150,000 after that -- for each motion picture that PentAmerica completed during his tenure (February 1, 1991 Employment Agreement ("PentAmerica Agreement")(Exh. 137).  The PentAmerica Agreement went to some length to reiterate, as promises under the agreement, many of the fiduciary duties that California law requires of all employees and agents.  *See generally*, Restatement (Third) of Agency §§ 8.01 *et seq.*  For example, Nunnari promised to comply with instructions from the company (¶1), to render services "solely and exclusively to [PentAmerica]" (¶1), to protect his employer's trade secrets and confidential information (¶ 9), to refrain from competing or engaging in activities adverse to his employer (¶1), and to account for profits (¶ 10).

Nunnari developed dozens of film projects at PentAmerica, three or four of which were produced and released.  Nunnari uses the term "creative producer" to describe his role at PentAmerica on the projects that were not produced (and the pre-production work on those that were produced).  He considers himself a "creative producer" today and uses the term to describe all of his work since PentAmerica.  According to Nunnari, a "creative producer" identifies and acquires the motion picture rights in a novel or other literary property and enhances its value by "attaching" (obtaining commitments from) writers, directors, actors, and other talent willing to work on the film.  For example, the idea for the PentAmerica project, *Silence*, a motion picture based on Shusaku Endo's novel of the same name, arose out of discussions between Mario Cecchi Gori and the renowned motion picture director, Martin Scorsese.  PentAmerica developed the

project, enhancing its commercial viability by obtaining Scorsese's commitment to direct it, if and when it was ever produced (March 1, 1990 Agreement, Exh. 444).

Although PentAmerica was based in Los Angeles, it followed the Italian film industry's business model, developing motion picture projects and financing production under the same roof – a model that the Hollywood studios had abandoned years before. The major U.S. studios are now primarily in the business of advancing the significant funds required to produce a motion picture in exchange for the lion's share of profits made in theatrical release and distribution in various media including DVDs, cable, satellite, and television.   Studio executives routinely entertain proposals to finance fully or partially developed motion pictures packaged by outside "creative producers," i.e., projects with a screenplay, director, actors and other talent committed to perform if and when the project is produced.   Much as PentAmerica paid a producer fee to Nunnari for each motion picture produced during his tenure, the major studios commonly pay producer fees to producers-for-hire, i.e., professionals engaged to manage pre-production, principal photography, and post-production who are paid as each phase commences.

Operating under the Italian business model, PentAmerica was not profitable and, by 1993, Berlusconi wanted out of the business.  VCG was similarly disheartened and, according to Nunnari, would have given up on producing U.S. movies altogether, but for Nunnari's urging to the contrary.  In the end, Cecchi Gori Group Europa N.V. ("CGGE") bought out Berlusconi's interest and kept the U.S. production business alive by

9

acquiring the rights to the PentAmerica projects under development (the "PentAmerica

Projects" identified on Schedule A to Exhibit 89).

After PentAmerica disbanded, VCG employed Nunnari in Los Angeles as

President of CGP, to continue the distribution business, as well as the development and

production of film projects.  He also appointed Nunnari as President of CGUSA, the

company that succeeded CGGE as owner of all rights in the former PentAmerica

Projects.

## C. VCG's Distribution Business Takes Off in the Mid-1990s.

While PentAmerica was struggling, VCG changed direction to embrace a new

opportunity created when the Italian government abandoned its monopoly on television

networks to allow private entities to own and operate commercial networks.  VCG's

cohort in PentAmerica, Silvio Berlusconi, founded one or more of the new networks and

was eager to find content to fill the many new hours of programming.  With Nunnari in

Los Angeles, CGG was well positioned to serve as a middleman between Berlusconi

and U.S. studios and other entities eager to sell foreign distribution rights in their motion

pictures and television shows.

For the next several years, VCG, Nunnari, and a CGG consultant in Italy, Faruk

Alatan, worked together very closely on this business, speaking to one another on a

daily basis, spending time together at film festivals, on vacations, and in Rome.  In the

process, they became close personal friends.  It was apparent from Nunnari's testimony

at trial that Nunnari enjoyed his relationship with VCG during these years.  Although he

always felt undercompensated for his efforts, Nunnari admired VCG's nimbleness in

changing direction to make a profit. Anna Gross, a former PentAmerica and CGP Development Executive who testified at trial, likewise portrayed VCG as the consummate entrepreneur, doing business, first and foremost, to make a profit. VCG's testimony underscored the point. While VCG is passionate about his work, he focuses on profitability rather than artistry for its own sake. Indeed, VCG attributes his success in the motion picture business to his skill in recognizing, from the outset, a commercially viable film concept, as opposed to his skill in executing its development or production.

In his testimony, VCG came across as a voluble, expansive, and sometimes emotional personality who focuses on the big picture and delegates as many details as possible to trusted advisors like Nunnari. He does business on the basis of personal relationships. He prefers face to face meetings and avoids communicating by letter, fax, email or other less personal means. VCG speaks little, if any, English and his trust in Nunnari was so unquestioning that, at Nunnari's request, VCG sometimes signed his name on agreements and memoranda without translating or understanding them. VCG's employees in Rome were similarly trusting of Nunnari. Over the years, they promptly paid and rarely questioned Nunnari's requests for reimbursement of expenses for business, travel and entertainment on the assumption that they were incurred for legitimate CGP and CGUSA expenses.

As VCG's distribution business thrived, he set off in many new directions, investing in an Italian soccer team, fine art, an Italian television network, a theater in Beverly Hills, and luxury residential properties in Los Angeles, New York and London, often relying on Nunnari to advise him in these endeavors. Nunnari worked very hard

on VCG's various business endeavors meanwhile accommodating VCG's personal requests such as renting yachts, arranging vacations, and the like. However, without the PentAmerica producer fees, Nunnari was making less money than before and was chagrined that VCG was unwilling to finance production of U.S. motion pictures.  VCG apparently appeased Nunnari's demands for additional compensation by promising to supplement his salary with annual bonuses, but VCG failed to follow through.  Nunnari therefore took steps to earn producer fees outside of CGG by working as a producer for hire.

### D. VCG Allows Nunnari to Works as a Producer-for-Hire on Seven

By all accounts, VCG encouraged Nunnari's efforts in this regard.  He agreed, for example, to allow CGP to loan out Nunnari's production services on the former PentAmerica Project, *Seven.*  Under a March 17, 1994 agreement, Katja Productions agreed to pay CGP a $300,000 producer fee for Nunnari's work as a producer for hire, and promised as much as $200,000 in additional income out of net profits (the "Katja Agreement," Exh. 207).   Although his production work on *Seven* took Nunnari away from CGP and CGUSA for eight weeks of on site pre-production and the additional time necessary for principal photography, VCG generously authorized CGP to pay the entire $300,000 producer fee to Nunnari (Exh. 207, ¶3.2).

12

### E. HGP Negotiates Directly with Disney for Nunnari's Producer Services on Ferrari.

After working as a producer for hire on *Seven*, Nunnari created his own limited liability companies (initially Tex Film, Inc. and later, HGP) to displace CGP as the entity loaning out his production services.  It is common practice in the film industry for self-employed producers to form wholly owned corporations to "employ" them and to "loan out" their services so that they can deduct, from the company's taxable income, business expenses such as office overhead, employee salaries and accounting services.  HGP's initial business – producing commercials – was not a business that CGP or CGUSA engaged in, or that VCG had any interest in.   However, Nunnari and Gross soon focused HGP's business on development of motion pictures projects – CGP's core business.

For example, in early fall of 1996, Nunnari embarked on negotiations with Disney for production of another former PentAmerica Project known as *Ferrari*.  Without any disclosure to VCG or GCC in Rome, Nunnari negotiated with Disney both as President of CGP (representing CGGE) and as the managing member of HGP.  As of September 4, 1996, Nunnari signed two separate agreements with Disney.  He sold an option on CGGE's rights in *Ferrari* (for $100,000 up front, another $100,000 for any extension of the option, and an additional $118,000 if and when Disney commenced principal photography (Exh. 140)).  Nunnari signed a separate agreement, under which he and two other entities sold their producer services to Disney in exchange for a fixed producer fee of $2,000,000 if and when Disney produced the film.  Nunnari's fixed payment was $500,000 and he stood to earn as an additional $325,000 on the film as a

percentage of "adjusted gross receipts" (Exh. 141)).   Since Nunnari's producer agreement on Ferrari identifies three producers and provides for a lump sum payment rather than payment for each stage of production services (preproduction, production and post-production), the compensation appears to be unrelated to the services typically rendered by a producer for hire.   Disney never produced *Ferrari,* but if it had, Nunnari would have earned, for his role as a "creative producer," roughly twice as much as CGGE's maximum potential return for sale of its rights in the project.   As CGP's top creative executive, Nunnari's negotiation for this compensation was a conflict of interest and a breach of his fiduciary duties.

## F. Nunnari Proposes Terms for a Written Employment Agreement with CGP.

While the *Ferrari* Producer Agreement was in the works, Nunnari asked VCG to formalize his employment arrangement in a written agreement.   Nunnari collaborated with his partner in HGP, CGP's Development Executive Anna Gross, to come up with a proposal.   As Gross candidly explained in her testimony at trial, she and Nunnari formed HGP because they shared a thirst for production – and because they needed to augment their income.   Gross' notations, marking up a copy of Nunnari's 1991 Employment Agreement with PentAmerica (Exh. 137), are evidence of their efforts to obtain VCG's signature on an employment agreement with language that they believed would give  Nunnari and HGP the right to compete with CGP in the motion picture development and production business.

Nunnari and Gross drafted language that continued Nunnari's $250,000 annual salary (with 10 percent annual increases), but omitted provisions requiring his employer to pay producer fees on motion pictures produced under his supervision (Exh. 137 ¶¶ 1,3).   They deleted the provisions in the PentAmerica Agreement specifying that Nunnari would render services "solely and exclusively" to his employer; refrain from any "outside activities without the express written consent of [his employer]" (Exh. 137 ¶ 1); and refrain from "engag[ing] or invest[ing] in any other business . . .  the purpose of which is the development of motion pictures or any related business . . . or interest, direct or indirect, in competition with [his employer]" (Exh. 137 ¶ 9).

As executed, Nunnari's October 22, 1996 Employment Agreement with CGP (the "1996 Agreement")(Exh. 2) states that Nunnari is employed "to render his exclusive services to the Company as an  executive of Company but non-exclusive to the Company as a producer-for-hire."   Based on this language, Gross and Nunnari believed, and continue to believe, that VCG agreed, from the outset, that Nunnari could compete with CGP by developing motion picture projects for HGP while engaged in exactly the same business for CGP.   They base their belief on the wording of the 1996 Agreement and their claim that VCG acceded to this arrangement, i.e., that he knew all about HGP's myriad business deals and waived the duties of loyalty that Nunnari, Gross and other employees owed to CGP with respect to them.

Gross testified, for example, to a conversation she had with VCG in 1996 or 1997 while she and Nunnari were in Tuscany for HGP's production of a $3 million commercial.  Gross says that she told VCG (in Italian) all about HGP's business of

15

producing motion pictures and commercials.  She testified that VCG said he was not interested in the business, even after she invited him to invest in HGP.  Nunnari testified to similar conversations with VCG in the same time period and to VCG's expression of non-interest.

Gross's credibility was compromised, however, because she was Nunnari's partner in HGP (while serving as an executive for CGP) and has a continuing business relationship as a paid consultant for HGP.   With regard to the conversation with VCG in 1996 or 1997, it is plausible that she mentioned HGP's production of commercials to VCG and that he expressed no interest in pursuing that business. Given VCG's generous personality, it is also plausible that he supported their efforts and did not make an issue out of the time they spent away from their duties at CGP to shoot the commercial in Italy.  It is not credible, however, that a businessman like VCG had no interest in knowing that, instead of working on CGP/CGUSA's motion picture business, his top employees in Los Angeles were pursuing the very same business on their own account.  In other words, it is not credible that VCG's alleged lack of interest was based on an adequate disclosure of HGP's real business plan.

## G. Nunnari Expands His Staff in Los Angeles.

From 1996 on, Nunnari expanded the number of people on CGP's payroll and directed them to work on developing motion picture projects for CGP and for HGP out of CGP's Los Angeles Office.  By the fall of 2000, Nunnari had hired and was directly supervising a financial officer/treasurer (Roland Lilavois); one or more development executives (initially Anna Gross, succeeded by Paula Kahlenberg, Scott Coleman,

Nathalie Peter-Contesse and others); a development consultant, Alessandro Camon (Exh. 205); and a personal assistant, Marina Salvo – all of whom reported to and were loyal to Nunnari.  He added a new position in November 2000, hiring attorney Claire Ambrosio as General Counsel and Vice President of Business Affairs, reporting directly to him (Exh. 208).  According to her employment agreement, Ambrosio was employed to service several CGG entities (CGP, CGUSA, Robert Lane Estates, Inc., and CPW Acquisition Corporation).  After she joined CGP, Nunnari directed her to work for HGP as well.

In her testimony, Ambrosio portrayed Nunnari as a hard-driving executive who frequently expressed impatience by raising his voice and occasionally throwing papers or other objects at employees.  Although she admitted that she walked off the job after Nunnari threw something at her in a conference room, the court nevertheless found her to be a credible and unbiased witness.  Other former CGP employees downplayed Nunnari's explosive propensities, but uniformly regarded him as a "take charge" and very "hands on" executive who made all decisions of any importance in the office.  Nunnari also testified that nothing happened at CGP without his involvement; he was "the boss."

According to Ambrosio, Nunnari took steps to conceal HGP's activities from Rome and carefully monitored whether office correspondence went out under CGP or HGP letterhead.  After the staff created separate files for CGP and HGP correspondence, Ambrosio noticed that the office used CGP letterhead on initial correspondence soliciting interest in CGP projects and switched to HGP letterhead after

the CGP addressee expressed interest in working on the project.  Ambrosio also noticed that the office never sent anything on HGP letterhead to VCG or others at CGG's headquarters in Rome.  She also remembered a day when Nunnari's assistant, Marina Salvo, specifically instructed everyone in the office to avoid doing so. Ambrosio's testimony about the policy was corroborated by the dearth of correspondence with Rome on HGP letterhead or correspondence that mentioned or referred to HGP.

Although Nunnari and Salvo denied that there was a policy of concealing HGP's business dealings from VCG, Nunnari did not deny that he made the decision whether a project would proceed as a CGP or an HGP development project.  Nunnari's testimony at trial -- that if he had an idea that was his passion, it went through HGP, but if the idea came from Rome or VCG, it went through CGP – suggested that he made his decision as an artist rather than a businessman.  His candid admission  in a June 28, 2008 email -- that he only cares about credit, position and money – better explains, and is more consistent with, his decisions whether to advance the projects under the HGP or CGP name (Exh. 641).

### H. Nunnari and his Subordinate Execute an Option Conveying CGUSA's Rights in Silence to HGP

The circumstances leading up to CGUSA's purported assignment, to HGP, of CGP's option rights in *Silence* lends credence to Ambrosio's observation that projects with promise of success ended up in HGP's inventory.  In 1998, after CGGE acquired the rights to Endo's novel, Scorsese's loan out company signed a further agreement

with CGGE (executed by Nunnari) agreeing that Scorsese would direct *Silence* as his third motion picture after *Kundon* (February 2, 1998 Agreement, Exh. 444, p. CSC00071*).  When CGUSA succeeded CGGE on these rights, *Silence* became one of CGP's most promising development projects.

In a series of questionable 2001 memoranda and agreements, Nunnari documented CGUSA's transfer of its intellectual property interest in *Silence* to HGP. Nunnari testified that he set the transfer in motion in the spring of 2001 by convincing VCG that Nunnari should be fully empowered to act for CGP when VCG was unavailable.   Nunnari testified that, on that basis, VCG signed two memoranda (written in English) -- an April 30, 2001 memorandum authorizing CGP and CGUSA executives "to enter into any necessary option/purchase agreements with [HGP]" for *Silence*, *Ferrari*, and other specified projects; and a May 1, 2001 memorandum conferring the same authority "for any project owed by or assigned to CGUSA" (Exh. 23).

There is no evidence that Nunnari ever disclosed to VCG that Roland Lilavois (one of Nunnari's subordinates in the Los Angeles Office) was meanwhile transferring an option on CGUSA's rights in *Silence* to HGP for a nominal sum.  On the same day that VCG authorized CGP and CGUSA to confer any option rights in *Silence*, Lilavois executed a May 1, 2001 Option/Assignment of Rights Agreement (the "2001 HGP Option")(Exh. 35) accepting $5,000 from HGP as consideration for an 18-month option on *Silence* against a purchase price of $786,000 (the amount that VCG had invested in this PentAmerica Project to date), a commitment to give VCG "executive producer" credit on the film, and five percent of potential net profits.  The 2001 HGP Option and

extensions signed by Lilavois' successor, Ludy Blasco, put Nunnari in the driver's seat on the project as Scorsese's commitment came due.

## I.  HGP Develops and Produces 300.

Nunnari is credited as co-producer on *300*, the commercially successful motion picture based on Frank Miller's graphic novel about the Battle of Thermopylae in the Peloponnesian War.  VCG claims that he had the idea, all along, to make a "sword and sandal" motion picture on the same subject and testified that, for years, Nunnari rebuffed his suggestions.   Nunnari claims that his passion for the subject matter began when he was a schoolboy in Italy and that the idea crystallized in 2000, when he came across Miller's graphic novel in a bookstore and recognized its commercial potential.[3]

Nunnari immediately instructed his staff to investigate optioning the rights to the novel.  Acting for CGP, Ambrosio commissioned a copyright search on the title and corresponded on CGP letterhead with Miller's agent in November 2000 (Exhs. 12, 209). Nunnari meanwhile forwarded a copy of the graphic novel to producer Jerry Bruckheimer in March 15, 2001, using a CGP logo note card.   Nunnari testified that at around the same time, he also sent a copy of the novel to Rome and asked VCG to invest money in the project, commenting that "if I had the money, I'd do it right away."

---

[3] Testimony from producer Carlo Carlei raises questions about Nunnari's credibility on this point. Carlei testified that he brought the novel to Nunnari's attention and that Nunnari cut him out of further development activities.  On that basis, Carlei filed a lawsuit against Nunnari which settled out of court.

According to Nunnari, VCG said he had no interest, especially in a graphic novel, and wished him "good luck."

Although Nunnari testified that he told VCG "if he had the money" he would invest it in *300*, he invested very little. Instead, consistent with the role of a "creative producer," he set out to find others willing to partner with HGP on developing the project. Knowing that producer Mark Canton's assistant, Michael Gordon, was an aspiring screenwriter, Nunnari (HGP) paid Gordon a nominal sum, $7,500, to hastily write a screenplay for *300* (October 7, 2002 Agreement, Exh. 134). Although Nunnari shopped Gordon's screenplay to various studios and producers, only Gordon's boss, Mark Canton, expressed any interest. Two months after HGP commissioned Gordon to write the screenplay, Canton agreed to pay HGP $150,000 for a 50% interest in Gordon's script and the right to co-produce the project with Nunnari, sharing any potential producer fees 50/50 (December 16, 2002 co-production agreement, Exh. 28). Nunnari and Canton eventually persuaded Warner Brothers to finance production, and the motion picture was released in March 2007.

Nunnari testified that he was very open with VCG as he progressed with *300* letting him know, for example, when he obtained the rights to shop *300* to the various studios. Nunnari also testified that his involvement in the project was widely reported in U.S. trade magazines – magazines that VCG admitted reading, in translated synopsis form – and that VCG congratulated him on the movie's success, never asking for any share of Nunnari's earnings on it. There was no evidence, however, that Nunnari ever disclosed the terms of any prospective agreements that he or HGP entered into with

respect to 300 or disclosed that CGP employees were working on the project.   He also apparently concealed, from Canton, his dual roles in HGP and the VCG entities. Canton testified at trial that until Nunnari filed this lawsuit, he had no idea that Nunnari was in any way affiliated with any CGG entities.

## J. VCG and Nunnari Negotiate the 2003 Employment Agreement.

As *Silence* and *300* moved toward production under the HGP banner in 2002, Nunnari's written employment with CGP came up for renewal.  By that time, VCG's successful Italian distribution business had died out and CGG was struggling to meet basic obligations and Nunnari was an invaluable advisor and intermediary with U.S. companies involved in restructuring CGG's obligations, such as Merrill Lynch Capital Markets, Ltd.   Nunnari's pivotal role in such matters explains why VCG agreed to extend his employment agreement by executing an "Addendum to Employment Agreement" (the "2002 Extension") (Exh. 3).  In that document, VCG agreed to pay Nunnari $250,000 on October 1, 2001, and to additional payments adding up to $1,650,000 for bonuses that VCG had verbally promised to pay Nunnari over the years. (Exh. 3, ¶2).  VCG also promised to pay $2.5 million in severance for termination without cause and personally guaranteed all of his companies' obligations under the 2002 Extension (Exh. 3, ¶ 4).

When CGP missed the October 1, 2002 bonus payment, Nunnari took immediate steps to tie up VCG's $12 million residential property in Los Angeles.  VCG had formed Robert Lane Estates, Inc. ("RLE") to hold title in the property.  Relying on RLE stock pledged to him as collateral for VCG's guarantees under the 2002 Extension, Nunnari drafted an agreement giving himself a five year option to purchase the property at the

below-market price of $4 million. Nunnari signed the agreement on behalf of both sides – for RLE as "optionor" and for himself "optionee" (Exhs. 228, 229). Consistent with his practice in executing other agreements to his benefit, Nunnari did not disclose the real estate transaction to VCG before he signed it. He did, however, record the option with the Los Angeles County Recorder, placing any potential purchaser on notice that he alone had the right to purchase the property until 2007.

VCG was understandably dismayed when he found out about Nunnari's recorded option. He hired New York attorney, Nicholas Gianuzzi, to settle Nunnari's claims related to the bonus payment and to get the lien removed. On December 23, 2002, Gianuzzi proposed terms for a new written employment agreement to Nunnari's lawyer, Leo Cotugno (Exh. 240). Among them was a provision requiring Nunnari to promise not to compete with CGG for two years following termination. Although this term is not in the signed version of the agreement, VCG's request for a non-competition clause is significant. VCG had, of course, given Nunnari his blessing to provide producer services on *Seven*. If he knew and was content to have Nunnari currently competing with CGP through an independent company, he had no reason to ask Nunnari to refrain from competing after the termination of his employment. In other words, this request was consistent with VCG's testimony he had no idea that Nunnari was operating HGP out of CGP's offices or that they were competing with his companies in the motion picture development business.

After additional negotiation, VCG and Nunnari signed a February 3, 2003 Revised and Restated Employment Agreement and Resolution of Claims Agreement with CGP, CGUSA, VCG, and various CGG entities (the "2003 Agreement")(Exh. 4).

The 2003 Agreement reconfirmed Nunnari's obligation to render services as President of CGP through October 1, 2005, with the same duties and responsibilities as in the 1996 Agreement (Exh. 4, p.1). Hearkening back to the 1996 Agreement, which allowed Nunnari to work as a producer-for-hire on a non-exclusive basis, the 2003 Agreement acknowledged that "Nunnari has the right to engage in independent productions and that his work in connection therewith is not in breach of any terms of this Agreement or any prior agreements" (Exh. 4, ¶ 4).

With Nunnari a key player in CGG's ongoing financial crises (e.g., Exh. 30), VCG agreed to raise Nunnari's annual salary to $475,000 and to supplement that salary with semi-annual payments sufficient to increase his compensation by $250,000 after taxes. VCG also restated his promise to pay Nunnari $2.5 million in severance for any termination without cause (¶ 8(a)). Since the parties had claims against each other – Nunnari's claim to unpaid bonuses and VCG's claims with respect to the RLE property – the 2003 Agreement includes a mutual release of any and all claims, both known an unknown (¶16). It also includes standard language confirming that any waiver of performance under the agreement, going forward, would not be a waiver of any succeeding breach (¶14).

Although Nunnari gave testimony suggesting that HGP's profitable independent film development business was a further basis for obtaining a release from VCG, there was no corroborating evidence that the parties ever discussed this issue or that it was negotiated, such as correspondence, emails or other documentation alluding to it. The language of the Agreement is also inconsistent with Nunnari's contention because the CGG entities did not release HGP – the company through which Nunnari was conducting all of his independent activities -- from any and all claims. In ¶16, the CGG

entities only released "Nunnari and his agents, representatives and assigns" whereas Nunnari released all of the named CGG entities "and their respective agents, representatives, assigns *and affiliated companies*" (emphasis added). With the prospect of substantial future income from HGP's production agreements, executed by Nunnari as HGP's managing member, it is unlikely that Nunnari or his attorneys would have failed to obtain an express written release of all potential claims against HGP if VCG was really intending to release Nunnari from all claims arising out of his independent business ventures.

### K. Nunnari Hires Flores as General Counsel and Sues Scorsese.

Soon after entering into the 2003 Agreement, Nunnari hired Craig Flores, an attorney with approximately four years experience, to replace Ambrosio as CGP's General Counsel.   Flores worked on various legal matters relating to CGG's burgeoning financial problems -- negotiating a workout of CGG's deal with Rupert Murdock's Italian cable company, Sky Italia; overseeing litigation involving CGG's ownership of a theater in Beverly Hills; and separately negotiating claims asserted by New Line, MGM and Miramax for past due royalties on CGUSA's purchase of Italian distribution rights.  He also worked extensively on HGP projects.  Unlike Ambrosio, Flores had firsthand knowledge that HGP was garnering profits on projects serviced by CGP employees.   The documents that he authored during his tenure with CGP demonstrate a clear understanding that HGP was using CGP employees and assets to develop competing projects and concealing its activities from Rome (Exhs. 315, 357, 410).

For example, Flores was directly involved in HGP's 2003 lawsuit against Scorsese.  After Scorsese reneged on his promise to direct *Silence* as his third motion picture after *Kundun,* Nunnari (HGP) hired a New York City contingency fee attorney to make a claim against Scorsese for breach of contract (Exh. 250).  Flores represented HGP in pre-litigation settlement negotiations, sending chain of title documents to opposing counsel to prove, among other things, that HGP had validly optioned *Silence* from CGUSA in 2001 (May 7, 2003 letter, Exh. 35).   A few weeks later, Flores supplemented his chain of title documents by forwarding a contemporaneously dated May 22, 2003 letter, written in English and apparently signed by VCG, confirming that the 2001 HGP Option was valid (Exh. 38).  Neither side produced a signed original of this letter. Although VCG admitted that the signature looks like his signature, VCG adamantly denied ever seeing or signing the May 22, 2003 letter.  After receiving the photocopy from Flores, Scorsese agreed to settle the case on terms highly favorable to HGP.  Among other things, Scorsese took over HGP's obligation to pay CGUSA the $786,000 purchase price under the 2001 HGP Option, and agreed to pay HGP another $1,000,000 in additional compensation (February 12, 2004 letter agreement, Exh. 264) ("Scorcese Settlement").

By suing Scorsese, Nunnari turned HGP's $5,000 "investment" (the option payment for CGUSA's rights in *Silence*) into a net return, after only two years, of $1,000,000 in cash and an "annuity" for substantial future income and producer credit based on Scorsese's renewed commitment to direct *Silence*.  CGP, on the other hand, received nothing for the time that its employees worked on HGP's behalf and CGUSA

only managed to receive the potential of $786,000 plus interest – its out of pocket investment in the project if the film went into production.

When the time came for Scorsese to perform by directing *Silence*, Scorsese decided to direct *The Departed* and *Shutter Island,* rather than *Silence,* next in order. As consideration for this breach of the Scorsese Settlement, Scorsese agreed to pay HGP/Nunnari millions more in compensation (Exh. 635) and to give Nunnari a gratuitous producer credit on *The Departed* and *Shutter Island,* i.e., credit awarded as consideration for the further settlement agreement rather than for any services to be rendered in connection with these films.

## L. VCG Extends Nunnari's Employment for Two More Years

Meanwhile, VCG continued to fall behind on basic obligations, including the semi-annual $250,000 payments to Nunnari.  Nunnari's attorney, Lee Cotugno, sent demand letters for each missed payment which culminated in a negotiated payment schedule that VCG again failed to meet (Exhs. 44-46, 47-50, 52, 55).

CGG's persistent financial problems explain why, when the 2003 Agreement came up for renewal, Nunnari's lawyer proposed a reduction in Nunnari's severance from $2.5 million to $1 million (April 18, 2005 letter, Exh. 56).  However, VCG wanted no part of any severance obligation and rebuffed Nunnari's request for a five year extension of employment.  The final agreement (the "2005 Agreement")(Exhs. 59, 336), memorialized in VCG's July 12, 2005 letter (countersigned by Nunnari) provides no severance payment for Nunnari and confirms a two-year extension, expiring on July 31, 2007, unless VCG agrees to a further extension, in writing, on or before that date.

There was no evidence, at trial, that VCG signed any writing extending the 2005 Agreement.  VCG also vehemently denies Nunnari's claim that VCG verbally agreed to

27

an extension.  VCG's position is that, in accordance with its terms, the 2005 Agreement expired when he failed to execute any written extension on or before July 31, 2007.

### M. Nunnari Continues to Work for VCG and Negotiates for CGUSA and HGP on Everybody's Fine.

Nunnari claims that VCG verbally agreed to extend the 2005 Agreement at a meeting in Rome, arranged by their mutual friend and former colleague, Faruk Alatan. After leaving CGG in 2001, Alatan sometimes acted as a go between for communications between VCG and Nunnari.  Nunnari testified that Alatan persuaded him to meet with VCG in Rome, and that VCG agreed, over dinner with Nunnari in September 2007, to a two year extension of the 2005 employment agreement and reinstatement of the $2.5 million in severance.   According to Nunnari, VCG was absolutely unwilling to put the extension in writing for reasons relating to VCG's pending bankruptcy proceedings.   Nunnari also testified that Alatan was a witness to the terms of the extension.

Alatan testified, however, that he did not attend the dinner meeting and did not know the terms of the parties' supposed agreement.  His testimony about Nunnari's contemporaneous statements undermines Nunnari's rendition of events.  Alatan testified that after the dinner meeting, VCG told him, "everything will be the same" and that the parties "agreed to extend through the end of the lease" (which was set to expire in July 2008).  Alatan testified that Nunnari meanwhile told him that he was not happy about the dinner meeting and later remarked, "Let's see if he [VCG] is going to write something."

Nunnari's disappointment is inconsistent with VCG's alleged comments that Nunnari would continue with his employment until the lease expired.  Nunnari's

anticipation that VCG might put something in writing is inconsistent with his own testimony that VCG adamantly refused to put anything in writing for reasons relating to CGG's bankruptcy proceeding. If VCG told him that the bankruptcy precluded him from executing a written extension, Nunnari had no reason to request or expect to receive anything in writing. VCG, on the other hand, testified that he did not and would never have extended Nunnari's written contract because, among other things, he had growing concerns that Nunnari was using CGP's Los Angeles office to operate his own company. From his point of view, Nunnari's written contract had lapsed and Nunnari's employment was at-will for as long as VCG continued to pay his salary. Alatan's testimony supports VCG's recollection. According to Alatan, VCG told him after the meeting in Rome that he and Nunnari had a hand shake agreement to maintain the status quo.

VCG's testimony with respect to the alleged oral agreement is more credible than Nunnari's for several additional reasons. First, Nunnari's claim that VCG reinstated the $2.5 million severance – a term VCG omitted altogether from the 2005 Agreement – is inconsistent with his testimony that VCG agreed to a two year extension *of the existing contract*. Second, there is no evidence that VCG received any consideration for reinstating the severance payment. Third, it is not credible that, having rejected Cotugno's 2005 request for reduced severance of $1 million and signed a 2005 Agreement with no severance obligation whatsoever, VCG would have reinstated Nunnari's $2.5 million severance in 2007.

What is credible and substantiated by the parties' conduct is that VCG told Nunnari he was willing to continue to pay salaries and keep the Los Angeles office operating at least through the end of the lease. Nunnari's conduct after the meeting is consistent with that. For example, without consulting with VCG or anyone else in

1   Rome, Nunnari and Flores were actively trying to find and lease alternative offices.  By

2   early Spring 2008, they were negotiating to lease space for HGP on the Warner Bros.

3   lot.  Although Nunnari testified that the space could house CGP/CGUSA and HGP, his

4   failure to disclose the lease negotiations to VCG is evidence that he had no expectation

5   that CGP would be paying the rent.  Nunnari meanwhile also engaged CGP's former

6   Treasurer, Roland Lilavois, to retrieve HGP's files in anticipation of moving.  In his

7   March 28, 2008 email, Nunnari explained that when he returned from Connecticut, he

8   "would like to start fresh and new with just Hollywood Gang," asking Lilavois to "take the

9   papers" from CGP's offices that Lilavois thought they would need (Exh. 422).   There

10  was no evidence, at trial, whether or to what extent Lilavois removed documents from

11  CGP's Los Angeles office.

12         After the 2005 Agreement lapsed, Nunnari conducted business as usual,

13  negotiating with third parties as a dual agent for HGP and CGP.  He made a deal with

14  Miramax to produce a remake of a *Stanno Tutti Bene,* aka *Everybody's Fine,* a former

15  PentAmerica Project later assigned to CGUSA.   Under an October 7, 2007 agreement,

16  Nunnari (CGUSA) negotiated an option that gave Miramax the remake rights in

17  exchange for immediate payment of $5,000 to CGUSA against a total purchase price of

18  $1,013,590 (the amount of CGUSA's investment in the project to date) (Exh. 407).   A

19  few weeks later, Nunnari (HGP), agreed to provide development and production

20  services to Miramax in exchange for immediate payment of a $10,000 "development

21  fee" to HGP, the promise of $610,000 to HGP in producer fees, additional contingent

22  compensation up to $225,000 depending on the success of the motion picture, and

23  credits for himself, as producer, and Craig Flores, as "executive producer" (October 30,

24  2007 Producer Loan Out Agreement, Exh. 408).

25

While *Everybody's Fine* was in the works, VCG was growing more suspicious of Nunnari's activities. In early November 2007, VCG approached Ambrosio, CGP's former General Counsel, for legal advice on how to straighten out the Los Angeles office. Meanwhile, Ludy Blasco was instructed to deal directly with Rome on financial matters - - without going through Nunnari or Flores (Exhs. 410, 35).

A few months later, VCG took action with respect to HGP's deal on *Everybody's Fine*, informing Miramax, on April 1 2008, that his company, CGUSA, owned the remake rights to *Everybody's Fine,* and that any agreement for production of the project had to be approved by him (Exh. 64). Although VCG retracted his position and Miramax released the film in theaters in 2009 (Exh. 66), VCG's claims against Nunnari/HGP remained unresolved. By April 2008, VCG was so concerned that he embarked on a plan to oust Nunnari as the signatory on CGP and CGUSA's bank accounts and close the office.

### N. VCG Closes CGP's and CGUSA's Los Angeles Office.

On April 7, 2008, Nunnari and Flores were at the airport ready to board a flight to Connecticut when a co-worker called to report that VCG had dispatched attorney William Moore to the office, with a security guard in tow, to terminate the employees and shutter the office. Flores rushed back the office to deal with the situation while Nunnari continued on to Connecticut.

When Moore first arrived at CGP's offices, he was relieved that Flores and the other employees were calm and compliant. They seemed so cooperative that he allowed HGP's accountant, Benita Powell, to remove several boxes of documents based on her representation that they contained HGP materials. Moore left the office in late afternoon, trusting the employees to gather their personal possessions and leave.

However, around 7:00 p.m., Blasco called him to report that no one was leaving and that Flores' wife, who is also an attorney, had come to the office as well.   When Moore returned at 8:30 p.m., he found Flores and his wife busily working at the computers, and other employees still present in the office.  Concerned that they might be removing documents, deleting files, or otherwise corrupting company records, he asked them all to leave the office and arranged to change the locks on the doors.  His suspicions may well have been justified.  At trial, Nunnari was unable to produce original signed versions of agreements and correspondence critical to his case such as the 2001 HGP Option on *Silence* and VCG's May 7, 2003 letter ostensibly ratifying that option.

Moore testified that he did not terminate Nunnari's employment.  There was no evidence that VCG or anyone else communicated to Nunnari any formal termination.  There was contrary evidence, including testimony relaying an April 7, 2008 message from Nunnari that he was never coming back and Nunnari's March 2008 email to Lilavois to the same effect.

## II. The Evidence Supports a Decision in Favor of Defendants on their Cross Complaint.

### A. Nunnari Owed Several Discrete Fiduciary Duties to his Employers, CGP and CGUSA.

There is no dispute that, for all relevant time periods, Nunnari served as President of CGP and CGUSA, reporting directly to VCG as the beneficial owner of these companies.  There was no evidence anyone other than VCG was Nunnari's superior in the CGG organization or had any authority to supervise his conduct.  CGP and CGUSA were therefore Nunnari's employers with VCG appointed to speak and act

for them. Unless VCG and Nunnari reached an agreement to the contrary, Nunnari owed a fiduciary duty to act loyally for their benefit on all matters connected with his employment. Restatement (Third) of Agency § 8.01. This means that Nunnari had to place his employers' interests first and subordinate his own interests to theirs. Id. § 8.01(b). Nunnari's overarching fiduciary duty, as an employee and officer of the company, included each of the following obligations:

(1) Nunnari had a duty not to acquire any material benefit from a third party in transactions he conducted on behalf of CGP and CGUSA, or otherwise through the use of his positions at CGP and CGUSA. Id. § 8.02. Also, since Nunnari's duties included identifying, assessing, and pursuing opportunities to maintain, buy, sell, and develop film projects for CGP and CGUSA, he owed a duty not to take personal advantage of any opportunity that arose in the course of that work and not to offer the opportunity to a third party, such as HGP. Id. Comment d. He was prohibited from taking personal advantage in the form of direct benefits, such as pecuniary gain, as well as indirect benefits that enhance reputation, such as on-screen "producer" titles. Id., Reporters' Notes c.

(2) Nunnari had a duty not to deal with his employers as, or on behalf of, HGP (or any other adverse party) in transactions relating to his employment. Id. § 8.03. "When an [employee] deals with the [employer] on the [employee's] own account, the [employee's] own interests are irreconcilably in tension with the [employer's] interests because the interest of each is furthered by action – negotiating a higher or lower price, for example -- that is incompatible with the interest of the other." Id. Comment b.

(3) Nunnari had a duty to refrain from competing with VCG and his companies and from taking action on behalf of, or otherwise assisting, HGP or any other competitor. Id. § 8.04. It is not a defense that Nunnari honestly believed that his activity would not injure his employers. Id. Comment b.

(4) To the extent that Nunnari acted as a dual agent (both for HGP and CGP/CGUSA) in transactions between them or with third parties, he had an *additional* duty to:

(a) deal with his employers in good faith; and

(b) disclose to VCG that (i) he was also acting for HGP; (ii) all other facts that he knew or should have known would affect VCG's judgment (unless VCG manifested that he knew or did not wish to know); and (iii) to deal fairly with VCG and his companies in such transactions. Id. § 8.06(2).

(5) Nunnari had a duty not to use CGP's or CGUSA's property (including their work product and confidential information) for his own or HGP's purposes. Id. § 8.05. As the employee in possession of the Los Angeles Office, overseeing all CGP and CGUSA employees, he had a duty to use the office and employees for his employers' benefit unless VCG agreed to a different arrangement.

## B. Nunnari Breached his Employment Agreements, Breached Fiduciary Duties, and Engaged in Concealment and Constructive Fraud.

Defendants proved, by a preponderance of the evidence, that Nunnari breached the fiduciary duties noted above. Nunnari failed to prove, by a preponderance of

34

evidence, that he was acting in good faith or that VCG (or anyone else in the organization in a position to take action on the conflicts of interest) consented to the breaches. He also failed to prove that he made transaction-by-transaction disclosures to anyone else in the organization including Piero Salussolia, Guia Loffredo and Faruk Alatan or to anyone else in a position to recognize and act on his conflicts of interest regarding CGP and/or CGUSA. Restatement (Third) Agency § 8.06, Comment *c*.

The same proof establishes that Nunnari engaged in constructive fraud, concealment, and breach of his employment agreements.

## 1. Nunnari's Work Developing and Producing Motion Pictures for HGP Violated Fiduciary Duties Owed to CGP and CGUSA.

VCG credibly testified that CGP was "absolutely" in the business of developing and producing motion pictures. Nunnari and other former CGP employees admitted that during Nunnari's tenure as an officer of CGP/CGUSA, he worked with CGP employees to develop motion picture projects for both CGP and HGP. There was ample documentary evidence that while Nunnari and other CGP employees were being paid to develop the former PentAmerica Projects and other projects for CGP from 1996 through April 7, 2008, they performed the same functions, often on the same projects, for the benefit of HGP.

In an effort to persuade the court that HGP's business was unrelated to his employment for CGP/CGUSA , Nunnari testified, at length, that after PentAmerica's demise, VCG was unwilling to finance CGP's production of motion pictures and later unable to do so because of financial difficulties. The court accepts, as true, that unlike

PentAmerica, CGP was not in the business of financing the production of its film projects.

There is no evidence, however, that Nunnari and HGP took up the "unrelated" business of financing motion picture production.   To the contrary, whether acting for CGP or for HGP, Nunnari did the same work – the work of a "creative producer" -- obtaining rights, commissioning scripts, and attaching directing and/or acting talent to enhance their value, leaving it to others to finance production.  This placed him in a direct conflict of interest with his employers.  It is no coincidence that when Nunnari simultaneously negotiated to sell rights to CGUSA projects along with his producer services on a project, the agreements yielded more compensation to HGP (in production fees and other compensation) than to CGUSA (for sale of its rights in the development projects).  Nunnari's public relations materials, apparently prepared to solicit individual investors to finance HGP's film projects, provide further evidence that he did the same work for HGP as for CGP and CGUSA (Exhs. 638, p. 13; 639, p. 5, 16-17).

## 2.  Nunnari's Failure to Disclose His Dual Agency and Proposed Transactions as a Dual Agent Was in Breach of His Fiduciary Duties.

As a fiduciary, Nunnari was obligated to place his employers' interests ahead of his own and to make sure that VCG knew everything that an employer would want to know about the business that he entrusted to Nunnari.  For each producer fee that Nunnari negotiated to receive from a third party in connection with the production of any

CGP or HGP project, it was Nunnari's burden to prove that he disclosed to VCG and received VCG's consent to: (1) his status as a dual agent; (2) the details of the proposed transaction; and (3) any and all material terms offered and/or rejected by each side during negotiations.   Restatement (Third) of Agency § 8.06 Comment *b*.  Nunnari failed to demonstrate disclosures to and consent from VCG or any other person in the organization who had authority to recognize the conflict of interest in his producer agreements and take action on it.  Id., Comments *b* and *c*.

Specifically, there was no evidence, at trial, that before or after negotiating HGP's producer deals on *Ferrari, Silence,* or *Everybody's Fine*, Nunnari disclosed his role as a dual agent, the proposed terms of his dual transactions, or any other information to VCG's ability to knowingly consent.  To the contrary, there was persuasive testimony and other evidence that Nunnari affirmatively concealed these HGP transactions from VCG (see e.g., Exhs. 285, 286, 287, 290, 305, 352, and 359).

Nunnari's work developing and producing *300* likewise placed him in a conflict of interest with his employers.  Nunnari admitted that the idea to develop a motion picture based on Frank Miller's graphic novel came to his attention while he was President of CGP.  Since he was already charged with identifying potentially successful film projects for CGP, every opportunity that came to his attention belonged to CGP and any independent exploitation of opportunity was a breach of duty.

The court did not believe Nunnari's testimony that he sent VCG a copy of Miller's graphic novel, *300,* invited VCG to invest in the project, informed him that HGP obtained rights to shop the project etc.  Even accepting Nunnari's testimony as true, these communications are not detailed enough for the court to find that VCG knowingly

consented to Nunnari's independent development of the project. See, e.g., Ehlen v. Lewis, 984 F. Supp 5, 9 (D.D.C. 1997) (noting that "[w]here a fiduciary acts in his own interest in dereliction of his beneficiaries' interest, more than some 'by the way' notice is required").

The court further finds Nunnari failed to prove, by a preponderance of evidence, that he was free to act as a dual agent because VCG manifested that he already knew or did not wish to know about Nunnari's or HGP's film development business on *300* or any other project.   Putting aside Nunnari's credibility as a witness, his testimony that VCG expressed no interest in buying the rights to Miller's graphic novel, *300*, and VCG's alleged statement wishing Nunnari "good luck" with respect to it,[4] are not a sufficient manifestation of knowledge and disinterest to relieve Nunnari of his fiduciary duties.  VCG's inaction, in the face of growing indications Nunnari was independently involved in *300*, is also insufficient to manifest his relinquishment of fiduciary obligations or give rise to any estoppel from later pursing claims against Nunnari and HGP.

Nunnari also failed to prove that he acted in good faith in his role as a dual agent. The discrepancy in financial return to HGP versus CGUSA that Nunnari negotiated on production agreements for former PentAmerica projects provides strong evidence to the contrary.  The persuasive evidence that Nunnari concealed his producer agreements -- credible testimony from Ambrosio and Blasco and the corroborating dearth of correspondence with VCG from or about HGP -- also vitiates his contention that he acted in good faith.  There is evidence, moreover, that as early as 2002, Nunnari understood what the law requires from an employee/fiduciary.  In a letter (cc'd to

---

[4] The inference that VCG was content to have Nunnari develop and produce *300* in competition with CGP is belied by Flores' testimony that VCG "grumbled" when *300* came up in conversation.

Nunnari), Nunnari's personal attorney explained that "[b]ecause of Mr. Nunnari's position in [CGP], he likely owes fiduciary duties to the company which require, among other things, that he not take positions adverse to his employer" and asked CGP "to waive any conflicts of interest that exist or may exist . . . as a result of the fiduciary duties owed to [CGP] by Mr. Nunnari" (Exh. 218).

### 3. VCG's Agreement that Nunnari Could Work as a "Producer-for-Hire" Was Not a Waiver of Nunnari's Obligation to Place his Employers' Interests Ahead of his Own.

The fiduciary duties that employees owe to employers are duties imposed by law and are also implied in their employment agreements. They are enforceable whether or not the employee expressly promises, in an employment agreement or otherwise, to comply with them. Employees in the entertainment industry have no special exemption from these duties. Indeed, Defendants proved, at trial, that the custom and practice in that industry is consistent with the applicable legal principles. Defendants' very credible expert witness, Mark Halloran, testified that "non-exclusive" agreements allowing an employee to also work as a producer for hire are not uncommon in the industry. He testified that the established practice when the parties agree to a non-exclusive arrangement is for the employee to disclose the pertinent details about each proposed engagement beforehand and to secure the employer's permission before proceeding.

Nunnari nevertheless argues that, by signing employment agreements allowing Nunnari to work as a "non-exclusive" "producer for hire" and/or engage in "independent production," VCG waived or consented to Nunnari's breaches of loyalty. In interpreting the employment agreements, the court finds that the words "non-exclusive" and

39

"producer for hire" do not refer to, let alone waive, any of the fiduciary duties that Nunnari breached in this case.  Moreover, fiduciary duties can only be avoided if the employer affirmatively agrees to release them on a transaction by transaction basis.  Otherwise, there can be no knowing or intelligent waiver.  Restatement (Third) of Agency, § 8.06 Comment *b*.  For that reason, courts may not enforce provisions purporting to waive duties of loyalty except in "highly specific agreements that do not present the dangers of systematic unforeseeability and potential for exploitation."  Restatement (Third) of Agency § 8.06, Comment b, (quoting Melvin Aron Eisenberg, *The Limits of Cognition and the Limits of Contract*, 47 Stanford L. Rev. 211, 249-250).  The language in Nunnari's employment agreements falls woefully short of these requirements and is therefore unenforceable as a waiver of any fiduciary duties.

### 4. The 2003 Employment Agreement Does Not Bar Defendants' Claims.

HGP was not a party to, and was not released under, the 2003 Agreement.  Whereas Nunnari expressly released the parties to the agreement and their "affiliated companies," Defendants only released "Nunnari [and] his successors and assigns."  The parties' decision to expressly distinguish between "successors and assigns" and "affiliated companies" is evidence that they purposely excluded HGP and any other company affiliated with Nunnari.  Defendants proved that HGP materially assisted (aided and abetted) Nunnari's breach of fiduciary duties.  *Kruss v. Booth* (2010) 185 Cal.App.4th 699, 729.  Since HGP was the conduit for Nunnari's remuneration on competing projects, Defendants are entitled to recover damages, jointly and severally,

from HGP and Nunnari.  Therefore even if the waivers and releases in the 2003 Agreement were enforceable as to Nunnari, Defendants would be entitled to recover damages from HGP.

The court finds, however, that Nunnari cannot enforce the waivers and releases in the 2003 Agreement because they only cover the known and unknown claims that existed as of February 3, 2003.  Since, in this case, Nunnari's breaches of fiduciary duties occurred after that date, the releases cannot bar Defendants' claims.  For example, HGP's May 2003 lawsuit against Scorsese was a breach that post-dated the effective date of the February 3, 2003 Agreement.  Although Nunnari attempted to obtain an option on *Silence* under the 2001 HGP Option, he took no immediate action on it.  His breaching conduct – using the 2001 HGP Option to advance an ownership interest in *Silence* -- occurred in 2003.  Likewise, Nunnari's conduct developing and exploiting *300* and *Everybody's Fine*, post-dated the February 2003 release.

These breaches of duty excused Defendants' obligation to perform under the releases.  Defendants also have grounds to rescind or cancel the 2003 Agreement based on Nunnari's longstanding concealment of his independent and competing business activities.

## 5.  Nunnari Also Breached Duties by Using CGP and CGUSA Employees and Assets for His Own Benefit.

Defendants also proved, by a preponderance of evidence, that Nunnari used CGP's office and employees to work on film development projects that benefited

Nunnari and HGP rather than CGP or CGUSA.  These breaches of duty provide an independent basis for the court's award of damages in their favor.

### C.  Defendants Failed to Prove Breach of Duty, Breach of Contract, or other Tortious Conduct with Respect to Immortals/War of Gods.

Defendants' theory of liability and the basis for their requested imposition of a constructive trust on *Immortals/War of Gods* is the doctrine of corporate opportunity -- the common law notion that a corporate officer or director may not take advantage of a corporate opportunity.  The American Law Institute, in its "Principles of Corporate Governance: Analysis and Recommendations § 5.05  (Current as of June 10, 2010) ("Principles"), states this general rule along with the requirement that, to avoid breach of fiduciary duty, a corporate officer must first offer the opportunity to the corporation with disclosure of the conflict of interest.  If the corporation rejects the opportunity, the officer may proceed on his own.

The Principles define "Corporate Opportunity" as "(1) any opportunity to engage in a business activity of which a . . . senior executive becomes aware either (A) In connection with the performance of functions as a . . . senior executive . . . or (B) Through the use of corporate information or property if the resulting opportunity is one that the . . . senior executive should reasonably be expected to believe would be of interest to the corporation, or (2) Any opportunity to engage in a business activity of which a senior executive becomes aware and knows is closely related to the business in which the corporation is engaged or expects to engage."

In this case, a literary agent submitted -- and Nunnari and Prenna reviewed while employed by CGP -- a 117-page script based on the ancient Myth of Theseus.   Prenna recommended that Nunnari "definitely take a look" at the submitted script (Exh. 637).

1  On April 2, 2008, just five days before CGP's attorney terminated Flores, Prenna and

2  other CGP/CGUSA employees, Nunnari apparently read the script and liked it because

3  he remarked that it was "bread for my mouth" (Exh. 637).

4      CGP claims that Plaintiffs' failure to leave the submitted script behind and its

5  failure to advise VCG to consider developing the script were breaches of fiduciary duty.

6  On that basis, Defendants ask the court to impose a constructive trust on all proceeds

7  from the film on the same subject matter that Nunnari and Mark Canton later co-

8  produced.

9      The court finds that Defendants failed to prove, by a preponderance of the

10  evidence, that there was a cognizable corporate opportunity or that Plaintiffs usurped it.

11  On the latter point, there was no evidence that Nunnari or HGP ever purchased the

12  submitted script or used it in connection with the Nunnari/Canton production.

13      If Nunnari and HGP never used or purchased the submitted script, they took with

14  them, at most, the idea of developing a film based on an ancient myth.  Ideas are as

15  free as air.  The idea of making a film based on a well known myth was as available to

16  VCG as to Plaintiffs.  Standing alone, the idea had little value, if any.  A corporate

17  executive does not have to offer opportunities to the corporation "where the amount

18  involved would be *de minimis*."  *Id.*, Comment to § 5.05(a).  Without further evidence,

19  the court cannot find that the submitted script was a corporate opportunity or that it was

20  usurped in breach of a fiduciary duty.

21
22  ***III. There Is Insufficient Evidence of a Current and Justiciable Controversy over
Ownership of Any Project other than Silence.***

23
24      In their Tenth Cause of Action, Defendants seek a declaratory judgment
confirming that CGUSA owns the intellectual property rights in a list of at least 115

25

1  projects that they contend were in development at CGP during Nunnari's tenure with the

2  company.

3       The court has found that there is a present and adjudicable controversy with

4  respect to Defendants' claim of ownership rights in *Silence*. The court finds and

5  declares that Nunnari and HGP acquired no intellectual property rights in *Silence* under

6  the 2001 HGP Option. Defendants proved, by a preponderance of the evidence, that

7  Nunnari acted as a dual agent and executed the 2001 HGP Option without the

8  necessary disclosures to and consent from VCG.[1] Plaintiffs failed to establish that

9  Roland Lilavois, the CGUSA officer who signed the 2001 HGP Option, had the requisite

10  authority to recognize or consent to Nunnari's conflict of interest. To the contrary, the

11  evidence was that Lilavois was Nunnari's subordinate and acted at his direction.

12  Defendants also proved that VCG did not sign the May 23, 2003 letter purporting to

13  ratify HGP's rights under the 2001 HGP Option.

14       The 2001 HGP option is therefore void and/or subject to forfeiture of any and all

15  benefits obtained under its provisions. To ensure that CGUSA reaps all past and future

16  benefits flowing from its ownership rights in *Silence*, the court will impose a constructive

17  trust on any and all proceeds flowing from Nunnari and/or HGP's exercise of ownership

18  rights under the invalid 2001 HGP Option (with reimbursement to Nunnari and/or HGP

19  for future services provided and reasonable expenses incurred in connection with the

20  exploitation of rights under the 2001 HGP Option, such as payment of attorneys fees in

21  connection with the Scorsese Settlement).

22

23

---

24  [1] The April 30, 2001 and May 1, 2001 memoranda purporting to give CGP and CGUSA authority to enter

25  into any necessary option agreement with HGP for *Silence* cannot operate as any waiver of Nunnari's
    fiduciary obligations of disclosure and consent. As noted above, agreements purporting to waive fiduciary
    duties on future transactions are not enforceable.

On the remaining projects at issue in the Tenth Cause of Action, the court finds that there is no present controversy over ownership in the intellectual property rights warranting any current adjudication. Craig Flores was the only witness who testified to the ownership of the projects under development at CGP. Except for the properties addressed below, Flores confirmed that Defendants or third parties own the rights to the projects. With respect to *11 Minutes,* Flores mentioned a claim to "control the property" until 2012 and a producer agreement; on *Plastic* and *Ronin,* he testified that HGP and/or Nunnari "own an interest" and are attached as producer(s). On *Wizard of Time,* Flores alluded to HGP's ownership of a script but there was no testimony or evidence of how, when, or by what means HGP acquired an interest in a script from Defendants.

Flores testimony regarding *11 Minutes, Plastic, Ronin and Wizard of Time* is too vague and indefinite to present a justiciable controversy regarding the rights to these projects.

## I. Legal Analysis of Nunnari's Complaint.

### A. Nunnari Cannot Prevail on his Breach of Contract, Fraud, or Promissory Estoppel Claims because there is No Credible Evidence that VCG Promised to Extend the 2005 Agreement or Pay Severance.

Nunnari failed to prove, by a preponderance of evidence, that VCG orally agreed or represented that he would extend the 2005 Agreement beyond its July 2007 expiration date and/or to reinstate his promise to pay $2.5 million in severance. Without a written employment agreement in place, Nunnari was an at-will employee who could be terminated for any reason or no reason. Nunnari failed to prove, however, that his employment was ever terminated. In any case, VCG had good cause to terminate Nunnari because Nunnari had breached fiduciary duties. Even if VCG had

agreed to pay severance upon termination, the obligation was excused by Nunnari's antecedent breaches of contract.

### B. Nunnari's Interference with Economic Advantage Claim Fails.

Nunnari's interference claim rests on correspondence that VCG and his attorneys sent to Miramax with regard to *Everybody's Fine*.  To succeed on this claim, Nunnari had to prove, among other things, that he or HGP had a prospective economic return and that Defendants' conduct was wrongful.  However, as noted above, Nunnari failed to disclose to VCG that he was dealing with Miramax on his own account and on behalf of CGP/CGUSA.  When VCG found out about the dual agency, he and his lawyers had every right to communicate with Miramax because Nunnari's conflict of interest gave CGUSA the right to rescind the transactions with Miramax.   Restatement (Third) of Agency § 8.03 Commend *d.*  Nunnari's interference claim therefore fails because there is no evidence of wrongful conduct.

It also fails because Nunnari and HGP have no lawful prospective advantage in *Everybody's Fine*.   Having proved that Nunnari breached fiduciary duties, CGP is entitled to the compensation that HGP negotiated to receive in connection with the project.

### C. Nunnari Failed to Prove Breach of Contract, Conversion, and Claim and Delivery; the Court Does Not Reach the Declaratory Relief Claims.

Nunnari also failed to present sufficient evidence to prove that CGP was obligated to reimburse the $520,062 he paid to CGP shortly before CGP closed the Los Angeles office.  Defendant's' expert accountant, Jan Goren, examined CGP's general ledger and identified detailed postings, as of December 31, 2005, confirming that Nunnari owed CGP $520,062.  After reviewing the source documents, Goren

concluded that the sum represented CGP's accumulated advances for expenses incurred by HGP.  Ludy Blasco corroborated Goren's testimony and there was no credible testimony from Nunnari or his expert to the contrary.   Through Goren's and Blasco's persuasive testimony, Defendants proved that Nunnari paid this money to CGP to satisfy a valid obligation – an obligation owed since December 2005.

Having made determinations as a matter of contract and law, the court finds no reason to provide declaratory or equitable relief.

**V.  Remedies.**

**A. Damages**

Through their expert witness, Defendants proved, by a preponderance of the evidence, that as of the time of trial, they suffered damages in the form of net lost profits of $13,266,125 calculated as follows: $8,600,933 (on *300*), $3,269,254 (on *Silence*), and $1,355,938 (on *Everybody's Fine*).[2]   Defendants are entitled to prejudgment interest on damages at the rate of 7% per annum.  Goren calculated that amount to be $ 2,608,075 plus $2,536.51 per day until judgment is entered.  Goren's damage calculations accounted for all appropriate deductions and offsets in favor of Nunnari and/or HGP.  Indeed, Nunnari's expert, Uemura, took little issue with Goren's analysis or offsets.  Although Uemura advocated a reduction in damages in the amount of $110,189, the court accepted Goren's explanation for this item and declined to make the requested adjustment in its damages award.  Since Nunnari was on CGP's payroll until April 9, 2008, Nunnari and HGP are not entitled to additional offsets for any

---

[2]   These damages do not include compensation for screen credits that Nunnari received or negotiated to receive on these projects because Defendants did not request damages on that basis or present evidence of their monetary value.

47

1   services ostensibly rendered to HGP or pre-termination bonuses that HGP may have

2   paid to Flores or other HGP employees.

### B. Accounting

5   The court orders Nunnari and HGP to account for any and all past and future

6   compensation and/or benefits that they have received or receive in the future, under any

7   agreements that Nunnari and/or HGP entered into while Nunnari was employed by

8   Defendants with respect to the six film projects addressed at trial: *300, Silence*

9   (including compensation flowing from *The Departed, Shutter Island, and Hugo Cabaret*),

10  *Everybody's Fine, Il Cyclone, Taming Ben Taylor, and Ferrari* (the "Films").

### C. Injunction

13  Nunnari's fiduciary obligations to Defendants on agreements relating to the Films

14  are ongoing.  In performing under such agreements, Nunnari and HGP must place

15  Defendants' interests ahead of their own.  To ensure compliance with these obligations,

16  the court enjoins Nunnari and HGP from taking any action in their capacity as parties to

17  any agreements relating to the Films without first disclosing the intended action to

18  Defendants and obtaining their express written consent.  Nunnari and HGP may not

19  withhold signatures on, or refuse to deliver, any documents necessary to effectuate

20  Defendants' rights under this Judgment.

### D. Constructive Trust

23  The court imposes a constructive trust in favor of Defendants and against

24  Nunnari and HGP with respect to any and all compensation and/or benefits that Nunnari

25  and HGP receive, or are entitled to receive, on or from the Films.  To the extent that

Nunnari and/or HGP provides post-judgment producer or other services under any agreements relating to the Films, they are entitled to reimbursement for the reasonable value of such services and reimbursement for reasonable expenses incurred in connection with such future performance under such agreements (including reimbursement for attorneys' fees owed in connection with the Scorsese Settlement).

Although Nunnari claims an offset on damages for the reasonable value of his post-termination services on *Everybody's Fine,* Nunnari failed to offer substantial evidence that he provided such services or the reasonable value of his services. Although, ordinarily, the negotiated contract price for services is substantial evidence of their value, Nunnari's conflict of interest in negotiating the producer agreement on *Everybodys' Fine* vitiates the evidentiary value of the agreed upon fees.  The only other evidence on this issue -- that Nunnari was off to Connecticut for principal photography of the film when attorney Moore closed down CGP's Los Angeles office -- does not prove that he provided services or provide any basis to assess their reasonable value. The court therefore declines to offset the damages awarded on *Everybody's Fine.*

### E. CGUSA Owns all Intellectual Property Rights in Silence Ostensibly Conveyed under the 2001 HGP Option Agreement.

As noted above, Nunnari was an undisclosed dual agent with respect to the 2001 Option on *Silence.*   The 2001 Option is therefore void and any rights purportedly acquired under the 2001 Option are subject to forfeiture.  Restatement (Third) Agency § 8.03, Reporters Notes *d.*

*F. There Is No Present Claim or Controversy Sufficient for Adjudication of Ownership Rights in any other Film Projects as Requested in the Tenth Cause of Action.*

To obtain a declaratory judgment, a party must demonstrate that there is an actual and present controversy that can be adjudicated. As noted above, Defendants failed to demonstrate a controversy over ownership rights to any projects other than *Silence.*

Dated this 25th day of March, 2011

_____

Amy D. Hogue
Judge of the Superior Court

**Exhibit 2**

<u>Option/Assignment of Rights Agreement</u>

This Option/Assignment of Rights Agreement ("Agreement") is made and entered into as of May 1, 2001 by and between HOLLYWOOD GANG PRODUCTIONS, LLC ("HG") and CECCHI GORI USA, INC. ("CGUSA") with respect to the proposed motion picture project tentatively entitled "SILENCE".

1.          <u>CONDITIONS PRECEDENT</u>.
HG shall have no obligation under this Agreement unless and until: (i) HG receives an executed copy of this Agreement (ii) HG approves the chain of title with respect to the Picture, approves all agreements with respect thereto and receives all assignments and releases which HG requires in connection therewith and (iii) the initial option period payment is made.

2.          <u>UNDERLYING AGREEMENTS</u>.
Reference is made to the following (referred to as the "Underlying Agreements") attached hereto as Exhibit "D".

CGUSA and HG now intend to effect the disposition of all CGUSA's rights and obligations in connection with the Picture, including without limitation all literary and dramatic materials developed under, and services rendered pursuant to, the Underlying Agreements.

3.          <u>PROPERTY</u>. The term "Property" shall mean (1) all literary and dramatic materials transferred by or created or written pursuant to the Underlying Agreements in connection with the Picture (the "Literary Material"); (2) the Underlying Agreements; and (3) all of CGUSA's rights of every kind and nature in and to the Picture and elements thereof or related thereto.

4.          <u>DELIVERY</u>. CGUSA has delivered to HG such original signed copies of the Underlying Agreements as it may have in its possession (and, otherwise, true copies thereof) and such copies of the Literary Material as it may have in its possession.

5.          <u>OPTION</u>. In consideration of the mutual covenants, warranties and representation made herein, CGUSA hereby irrevocably grants to HG the exclusive option (the "Option") to acquire all of CGUSA's right, title and interest of every kind and nature whatsoever (collectively, the "Rights") in and to the Property.

6.          <u>EXERCISE OF OPTION</u>.
The Option may be exercised by written notice thereof given at any time commencing as of the date hereof and ending eighteen (18) months after satisfaction of the Conditions Precedent set forth in Paragraph 1 above (the "Initial Option Period"); provided, however, that the Initial Option Period may be extended for an

1

additional period (the "Extended Option Period") of twelve (12) months by written notice to CGUSA during the Initial Option Period and by payment as provided in Paragraph 7.b. below; provided, further, that the Option shall be deemed exercised not later than upon the commencement of principal photography of the Picture. The Initial Option Period and the Extended Option Period, if applicable, shall be collectively referred to as the "Option Period".

b. If HG elects not to exercise the Option, then all rights granted herein to HG in and to the Property shall expire automatically and without notice at the end of the final day of the Option Period. Notwithstanding the foregoing, all new material which is not a part of the Property granted hereunder (that which is created by or on behalf of HG), as between CGUSA and HG, shall remain the property of HG irrespective of whether or not HG exercises the Option herein.

c. The Option Period shall be extended without notice for the duration of any event of force majeure (including, without limitation, any, riot, war, act of God, strike or labor controversy) affecting the motion picture or television industries or the development and/or production of the Property. Purchaser will notify Owner of any such extension in writing as soon as reasonably practical, provided that Purchaser's failure to do so shall not be deemed a breach of this Agreement.

7.        OPTION CONSIDERATION.

a.  Initial Option Period. In consideration of CGUSA's grant to HG of the Option, HG shall pay CGUSA the sum of $ 5,000 upon satisfaction of the Conditions Precedent set forth in Paragraph 1 above, shall be fully applicable against the Purchase Price set forth in Paragraph 8. below.

b. Extended Option Period. If HG extends the Initial Option Period as set forth in Paragraph 6. above for the Extended Option Period, then HG shall pay CGUSA the sum of $ 5,000 upon the commencement of the Extended Option Period, which shall also be fully applicable against the Purchase Price set forth in Paragraph 8. below.

8.              PURCHASE PRICE. If HG exercises the Option, then HG will own all of the Rights, and as payment in full for CGUSA grant of the Rights to HG, HG will pay to CGUSA the sum equal to the verifiable out of pocket expenses and interest incurred in connection with the development of a motion picture based upon or adapted from the Property, which are $756,823.00, as of the date of this agreement, plus interest at the rate of 8.5% per annum commencing on June 1, 2001 and continuing until the date the Option is exercised, less (1) an amount equal to the sum paid to CGUSA under Paragraphs 7.a&b above (the "Purchase Price"). Such Purchase Price shall be payable upon the earlier to occur of the exercise of the Option or the commencement of principal photography of the Picture.

2

9.       <u>Net Profits:</u> If a feature-length motion picture is produced pursuant to the rights granted hereunder, then Owner shall be entitled to receive contingent compensation equal to five percent (5%) of 100% of the "net profits", if any, earned from the exploitation of the Picture.

10.       <u>CREDIT.</u>  Upon the condition that the Picture is produced and CGUSA is not in material default hereof then Vittorio Cecchi Gori shall be entitled to receive "Executive Producer" credit in connection with the Picture as follows:

a.       <u>On Screen:</u>  On a shared card (which credit may be shared with other executive producers) on screen in the main titles of the Picture (wherever main titles appear) in the same group as other executive producers, in a size of type equal to 100% of the screenwriter, the director or any other producer type credit.

b.       <u>Paid Ads:</u>  In the billing block portion of paid ads issued by HG or under HG's control (subject to customary exclusions), in the same grouping as other executive producers, in a size of type equal to 100% of the screenwriter, the director or any other producer type credit. Notwithstanding the foregoing, if the director, writer or any other producer or executive producer is accorded credit in a so-called "excluded ad", then CGUSA shall also be accorded credit in such excluded ad (other than award, nomination or congratulatory ads naming only the person honored).

All other aspects' of such credit, including without limitation, size of type, placement, etc., shall be determined by HG in HG's sole discretion. Any casual or inadvertent failure of HG or any failure by a third party to comply with the provisions of this paragraph shall not be deemed to be a breach of this Agreement. Upon receipt of CGUSA's written notice, HG shall use its reasonable efforts to prospectively cure any such failure to accord credit, provided, however, that HG shall have no obligation to change prints or advertising already produced. HG shall use good-faith efforts to notify third parties of the foregoing credit obligations, provided that HG's failure to do so shall not be deemed a breach of this Agreement.

11.       <u>PURCHASER'S OBLIGATIONS.</u> In consideration of all rights herein granted to HG, HG shall in CGUSA's place and stead, assume and fully perform each and all of the terms, conditions and executory obligations of the Underlying Agreements and all applicable collective bargaining agreements in connection with the Picture on the part of CGUSA to be hereafter kept and performed.

12.       <u>CONCURRENT EXECUTION.</u> Concurrently herewith, CGUSA and HG are executing a short Form Option Agreement and a Literary Material Assumption Agreement, in the forms attached hereto as Exhibits "A" and "B" respectively. If HG exercises the Option, (i) the Literary Assumption Agreement shall be binding and effective as of the date of exercise of the Option without further execution and delivery, and (ii) CGUSA will promptly execute a Short Form Copyright

3

Quitclaim, in the form attached hereto as Exhibit "C", and deliver it to HG, and upon exercise of the Option and receipt of the Short Form Copyright Quitclaim, CGUSA hereby authorizes HG to file the Short Form Copyright Quitclaim in the United States Copyright Office. Exhibit "C" Short Form Copyright Quitclaim shall remain undated, and if HG exercises the Option, then HG shall insert the date of exercise of the option on Exhibit "C" and the signature on Exhibit "C" shall be deemed final and effective and Exhibit "C" shall be a valid and binding instrument, which, along with this Agreement, shall irrevocably vest in HG all of the rights granted to HG hereunder and thereunder. It HG does not exercise the option the Literary Assumption Agreement shall be deemed null and void and of no force or effect whatsoever, and neither CGUSA nor HG shall have any rights or obligations thereunder and, at CGUSA's request, the Short Form Copyright Quitclaim shall be returned to CGUSA.

13.     REPRESENTATIONS AND WARRANTIES. CGUSA represents and warrants that:

a.     CGUSA has not sold, transferred, assigned, or otherwise disposed of any of CGUSA's right, title or interest in and to the Property, and CGUSA has the right to enter into and perform this Agreement;

b.     There are no liens or encumbrances on the Property and no claims have been made or litigation instituted or threatened with respect thereto;

c.     CGUSA has not produced or authorized the production of any motion picture, television, radio or dramatic presentation based on the Property,

d.     Other than the Underlying Agreements, CGUSA has not entered into any agreements or made any commitments affecting the Property, and other than applicable collective bargaining agreements and the Underlying Agreements, there are no contracts, agreements or other documents affecting the Property and/or the Rights; and

e.     Prior to the date hereof, CGUSA did not breach any, and performed all, of the obligations which it was required to perform under the Underlying Agreements, and paid all sums which had accrued and were payable pursuant to the provisions of the Underlying Agreements.

Except as expressly provided in this Agreement, CGUSA makes no other representations or warranties, express or implied.

14.     INDEMNIFICATION BY HG. HG shall defend, indemnify, and otherwise hold CGUSA, its officers, directors, employees, agents, representatives, affiliates, successors and assigns, free and harmless from and against any and all liabilities, claims, demands, damages and costs (including reasonable attorney's fees)

4

(collectively, "Demands") arising out of or resulting from (1) any breach by HG of any term or condition of, including HG's representations and warranties contained in this Agreement and all exhibits hereto, and (2) the development, distribution and exploitation by HG, its licensees or assigns, of the Property and/or any and all motion pictures or other productions based in whole of in part on the Property, other than for matters for which CGUSA indemnifies HG under Paragraph 15 below.

15.     INDEMNIFICATION BY CGUSA. CGUSA shall defend, indemnify, and otherwise hold HG its officers, directors, employees, agents, representatives, affiliates, successors and assigns, free and harmless from and against any and all liabilities, claims, demands, damages and costs (including reasonable attorney's fees) arising out of or resulting from any breach by CGUSA of CGUSA's representations and warranties contained in this Agreement.

16.     ASSIGNMENT. Purchaser may assign and transfer this Agreement or all or any part of its rights hereunder to any person, firm or corporation without limitation.  Owner may not assign this Agreement or any of its rights hereunder. This agreement shall be binding upon and inure to the benefit of parties' respective licensees, successors and assigns.

17.     OTHER DOCUMENTATION. CGUSA and HG shall each execute and deliver to the other such further documents, if any, as are reasonably required to carry out and effectuate the purposes and intent of this Agreement.

18.     ENTIRE AGREEMENT. This Agreement expresses the entire understanding of the parties hereto and replaces any and all former agreements, understandings and representations, and contains all of the terms, conditions, understandings and promises of the parties hereto, relating in any way to the subject matter hereof. This Agreement cannot be modified or amended except in writing signed by both parties. CGUSA and HG acknowledge that no officer, employee or representative of the other has made any promise or representation not expressly set forth in this Agreement.

19.     GOVERNING LAW. Each of the parties submits to the jurisdiction of any state or federal court sitting in Los Angeles County, California, in

5

any action or proceeding arising out of or relating to this Agreement and agrees that any and all claims in respect of the action or proceeding may be heard and determined in any such court. Each party also agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court or in any other state. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety, or other security that might be required of any other party with respect thereto.

       a.      <u>Remedies</u>. With respect to any payment to be made to Owner hereunder, Owner agrees that should for any reason Purchaser fail to make such payment as herein provided, Purchaser shall not be deemed in default hereof unless and until, following such failure, Owner shall give Purchaser written notice demanding such payment and Purchaser shall have failed to make such payment within ten (10) business days after Purchaser's receipt of said notice. In any event, in the event of any breach or alleged breach of Purchaser's obligations under this Agreement (other than Purchaser's failure to pay the Initial Option Payment, the First Extension Payment or the Purchase Price) and subject to Purchaser's cure period set forth above, it is expressly agreed that Owner's sole remedy shall be to seek money damages in a court of competent jurisdiction and that in no event shall Owner be entitled to obtain any injunctive or other equitable relief (including, without limitation, rescission) or undertake any legal efforts to restrict the Purchaser's right to exploit the Property and in no event shall Owner have or be deemed to have a lien, charge or other encumbrance upon the rights granted herein or any exploitation thereof.

      20.      <u>NOTICES AND PAYMENTS</u>.

       a.      <u>To HG</u>. All payments, correspondence and notices which CGUSA is required or may desire to give to HG under or in connection with this Agreement shall be given in writing by addressing the same to

      To HG:  Hollywood Gang Productions, LLC
               11990 San Vicente Blvd., Suite 200
               Los Angeles, CA 90049

or at such other address of which addressee gives  CGUSA written notice, and by (i) depositing the same so addressed postage prepaid in the United States mail or (ii) delivering the same toll prepaid to a telegraph or cable company or (iii) personal delivery or (iv) telex receipt confirmed or (v) telecopier with telephonic confirmation or receipt by HG the same date.

       b.      <u>To CGUSA</u>. All notices, and correspondence which HG is required or may desire to give to under or in connection with this Agreement shall be given in writing by addressing the same to

      6

To CGUSA:     Cecchi Gori USA, Inc.
11990 San Vicente Boulevard
Suite 200
Los Angeles, CA 90049

or at such other address of which addressee gives HG written notice, and by (i) depositing the same so addressed postage prepaid in the United States mail or (ii) delivering the same toll prepaid to a telegraph or cable company or (iii) personal delivery or (iv) telex receipt confirmed or (v) telecopier with telephonic confirmation or receipt by HG the same date.

     c.     <u>Date of Notice</u>. Any notice mailed, telegraphed, cabled, personally delivered, telexed or telecopied as aforesaid shall be deemed to have been given on the date of mailing, telex or telecopying or the date of delivery to the telegraph or cable company or the date of personal delivery.

CECCHI GORI USA, INC.         HOLLYWOOD GANG
                                     PRODUCTIONS, LLC

Title _____        Title _____

7

## EXHIBIT A
## OPTION AGREEMENT

KNOW ALL PERSONS BY THESE PRESENTS that for good and valuable consideration, receipt of which is hereby acknowledged, the undersigned Cecchi Gori USA Inc. ("Owner"), hereby grants to Hollywood Gang Productions, LLC. ("Purchaser") and Purchaser's representatives, successors, licensees and assignees, the sole, exclusive and irrevocable right and option to purchase and acquire from Owner all right, title and interest, in all languages throughout the universe in perpetuity, in and to the feature length theatrical screenplay presently entitled "Silence" ("Property") and any other literary material now or hereafter created or owned, wholly or in part including, without limitation, all now existing and hereafter created titles, themes, ideas, stories, contents, dialogue, characters, artwork, visual images, issues, adaptations and other versions thereof, and in and to the copyright thereof and all renewals and extensions of such copyright.

The option may be exercised by Purchaser, or its heirs, representatives, successors, licensees or assigns as provided in that certain option/purchase agreement dated as of May 1, 2001 between Purchaser and Owner, and this agreement is subject to all of the terms and conditions of the said option/purchase agreement, all of which are incorporated herein by reference.

IN WITNESS WHEREOF, the undersigned has executed this instrument this _18th_ day of _JUNE_, 2001.

Cecchi Gori USA, Inc.

By: _____

Its: _TREASURER_____

8

EXHIBIT B
## LITERARY MATERIAL ASSUMPTION AGRFEMEENT

_____ ("Buyer") agrees with Cecchi Gori USA, Inc. ("Company") that the screenplay covered by this agreement is subject to the Writers Guild of America Theatrical and Television Basic Agreement of 1998 (herein the "Basic Agreement") and particularly to the provisions of Article 15.A.3. and 51.3 thereof pertaining to additional payments to writers on release of a theatrical motion picture based thereon to free television and in supplemental markets (but excluding paragraph h. of said Article 15.A.3.), and the said Buyer hereby agrees, expressly for the benefit of the Writers Guild of America, west, Inc., and Writers Guild of America, East, Inc. (herein referred to as the "Guild"), as representatives of the writers involved, to abide by and perform the provisions of said Basic Agreement and make the additional payments required thereunder, as aforesaid. For the purpose of applying such provisions of said Basic Agreement, the writer or writers of such material shall be treated in all respects as though the said material were written by such writer or writers while in the employ of the Buyer.

It is expressly understood and agreed that the rights of the Buyer to exhibit or license the exhibition of any motion picture based upon said material shall be subject to and conditioned upon the payment to the writer or writers involved of additional compensation, if any, required under subparagraph 3. (except paragraph h. thereof) of said Article 15.A and Article 51.3 of said Basic Agreement, and it is agreed that the Guild shall be entitled to injunctive relief and damages against Buyer in the event such payments are not made.

If the Buyer shall sell, transfer, assign or otherwise dispose of its rights in such material to any person or company with headquarters in the United States, it may obtain from the party acquiring such rights a separate agreement in the same form (including this sentence) as this agreement, and will notify the Guild thereof, together with the name and address of the transferee, and deliver to the Guild a copy of such assumption agreement; it being the intent hereof that the obligations herein set forth shall be continuing obligations on the part of such subsequent owners, of such material, so headquarters in the United States.

Buyer:

_____

_____

_____

Date:

9

EXHIBIT C
ASSIGNMENT

KNOW ALL PERSONS BY THESE PRESENTS that for good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, Cecchi Gori USA, Inc. ("Owner"), hereby grants to Hollywood Gang Productions, LLC ("Purchaser") and Purchaser's representatives, successors, and assignees as of May 1, 2001 the sole and exclusive right, title and interest, in all languages throughout the universe, in perpetuity, in and to the feature-length theatrical screenplay presently entitled "SILENCE" ("Property") and any other literary material now or hereafter created or owned wholly or in part including, without limitation, all now existing and hereafter created titles, themes, ideas, stories, contents, dialogue, characters, artwork, visual images, issues, adaptations, and other versions thereof, and in and to the copyright thereof and of any productions produced by Purchaser which are based thereon or derived therefrom and all renewals and extensions of such copyright(s).

Owner and Purchaser have entered into or are entering into a formal option purchase agreement dated as of May 1, 2001 relating to the transfer and assignment of the rights in and to said literary work, which rights are more fully described in said option/purchase agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in said option/purchase agreement, all of which are incorporated herein by reference.

IN WITNESS WHEREOF, the undersigned has executed this Assignment this _22_ day of _JUNE_, 2001.

Cecchi Gori USA, Inc.

By: _____

Its: _____

10

EXHIBIT D
UNDERLYING AGREEMENTS

1. Option/Purchase Agreement dated October 6,1989 between Shusaku Endo and Scorsese Productions.

2. Producer Agreement dated April 19,1990 as of January 8,1990 between Scorsese Productions, Inc., f/s/o Martin Scorsese, and Penta Films, Inc.

3. Writer Agreement dated October 12,1990 as of July 20,1990 between Cappa Productions, Inc. mmc for Scorsese Productions, Inc., f/s/o Martin Scorsese and Jay Cocks, and Penta Pictures, Inc. on behalf of Penta Entertainment Limited, A.V.V.

4. Short Form Assignment dated November 16,1992 between Cappa Productions formally known as Scorsese Productions and PentAmerica Communications, Inc. and Penta Entertainment Limited, A.V.V.

5. Asset Purchase Agreement dated September 15, 1993 between PentAmerica Communication, Inc. and Penta Entertainment Limited A.V.V.

6. Option Agreement dated November 29,1993 between Cecchi Gori Group Europa, N.V. and PentAmerica Communications, Inc.

7. Short Form Assignment dated January 1, 1995 between Cecchi Gori Group Europa N.V. and Penta America Communicates, Inc.

8. Rights Agreements dated April 4,1995 between Shusaku Endo and Cecchi Con Group Europa N.V.

9. Letter dated November 2,1995 from Robert D. Offer of Bloom Dekom, Hergott and Cook on behalf of Cecchi Gori Pictures, Penta Films, Inc. and PentAmerica Communication, Inc. to William R. Sobel of Edelstein & Laird attorney for Cappa Productions, Inc. terminating the Writer Agreement dated October 12,1990 as of July 20,1990 and Producer Agreement dated April 19,1990 as of January 8,1990.

10. Amendment dated February 2,1998 between Cappa Productions, Inc., f/s/o Martin Scorsese, and Cecchi Gori Group Europa, N.V. amending the producer agreement listed as number 2 above.

11. Termination of Option Agreement dated September 30, 2000 between Cecchi Gori Group USA, Inc. formally known as PentAmerica Communication, Inc. and Cecchi Gori Group Europa, N.V.

12. Amendment to Writer Agreement dated April 25, 2001 between Cappa Production, Inc., Andarko, Inc., f/s/o Martin Scorsese and Jay Cocks, and Cecchi Gori USA, Inc.

11

**Exhibit 3**

**Cecchi Gori USA, Inc.**
**11990 San Vincente Blvd., Suite 200**
**Los Angeles, California 90049**

May 22, 2003

Gianni Nunnari
Hollywood Gang Productions, LLC
11990 San Vincente Blvd., Suite 200
Los Angeles, California 90049

Re:   "Silence" / Cecchi Gori USA, Inc. / Hollywood Gang Productions, LLC /
Confirmation of Option/Assignment of Rights Agreement

Dear Gianni:

Reference is made to the Option/Assignment of Rights Agreement (the "Agreement")
dated as of May 1, 2001, between Hollywood Gang Productions, LLC ("HG") and Cecchi Gori
USA, Inc. ("Owner") with respect to the published book entitled "Silence" (a/k/a "Chin-Moku")
(the "Book") in connection with the motion picture project entitled "Silence" (the "Picture"),
whereby Owner granted HG the option to purchase all of Owner's right, title, and interest in and
to the Book and all other underlying rights upon which the Picture is to be based.

This letter will confirm that any and all of Owner's right, title and interest in and to the
Book and Picture have been validly optioned by HG and any document containing language to
the contrary or in conflict with such grant of rights to HG is hereby deemed null and void,
including, without limitation, that certain letter dated June 27, 2001 from HG to Owner.
Notwithstanding any statements to the contrary in such letter, Owner hereby affirms all of its
obligations, agreements, representations and warranties under the Agreement. This letter is
further intended to fully and completely cure any and all alleged/asserted questions and/or
defects pertaining to the chain of title on the Book and/or Picture.

Kind regards,

CECCHI GORI USA, INC.

By: _____
       Vittorio Cecchi Gori

Its: _____

ACKNOWLEDGED & AGREED:

HOLLYWOOD GANG PRODUCTIONS, LLC

By: _____
       Gianni Nunnari

C:\Documents and Settings\passman\My Documents\HGP[1].5-22-03.doc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civ. Action No.: 13 CV 0963

AARON RICHARD GOLUB and
AARON RICHARD GOLUB, ESQUIRE, P.C.,

Plaintiffs,

-against-

HOLLYWOOD GANG PRODUCTIONS, LLC,

Defendant.

## SUMMONS AND COMPLAINT

*Attorneys for Plaintiffs*
*Office and Post Office Address, Telephone*
Aaron Richard Golub, Esquire, P.C.
34 East 67th Street -3ʳᵈ Floor
New York, New York 10065
212-838-4811

To

Attorney(s) for

Service of copy of the within is hereby admitted

Dated

..............................

Attorney(s) for

---

═══════NOTICE OF ENTRY═══════

PLEASE take notice that the within is a (certified) true copy of a

duly entered in the office of the clerk of the within named court on

Dated,

Yours, etc.

Attorney for

*Office and Post Office Address*
Aaron Richard Golub, Esquire, P.C.
34 East 67th Street-3ʳᵈ Floor
New York, New York 10065

To

Attorney(s) for

═══════NOTICE OF SETTLEMENT═══════

PLEASE take notice that an order
of which the within is a true copy will be presented
for settlement to the Hon.

on

at                    M.

Dated,

Yours, etc.

Attorney for

Aaron Richard Golub, Esquire, P.C.
34 East 67th Street – 3ʳᵈ Floor
New York, New York 10065